PRECEDENTIAL
UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 14-1732
_____

HERNAN GONZALEZ-POSADAS,
Petitioner

v.

ATTORNEY GENERAL UNITED STATES OF AMERICA,
Respondent
_____

On Petition for Review of an Order of the
United States Department of Justice
Board of Immigration Appeals
(BIA: A-205-643-767)
Immigration Judge: Hon. Mirlande Tadal
_____

Submitted Under Third Circuit L.A.R. 34.1(a)
February 13, 2015

Before: CHAGARES, JORDAN, and VANASKIE, *Circuit Judges*.

(Filed: March 26, 2015 )
_____

Michelle P. Gonzalez
Aaron C. Morris
Immigration Equality
40 Exchange Place – Ste. 1300
New York, NY   10005
        *Counsel for Petitioner*

Eric H. Holder, Jr.
Thomas W. Hussey
Greg D. Mack
Brooke M. Maurer
United States Department of Justice
Office of Immigration Litigation, Civil Div.
P.O. Box 878
Ben Franklin Station
Washington, DC   20044
        *Counsel for Respondent*

_____

OPINION OF THE COURT
_____

JORDAN, *Circuit Judge*.

Hernan Gonzalez-Posadas petitions for review of an order of the Board of Immigration Appeals ("the Board"). Specifically, he argues that the Board erred in affirming an Immigration Judge's conclusions that he did not suffer past persecution on account of his sexual orientation and that he does not have a reasonable fear of future persecution on that basis. We will deny the petition.

## I.  Background

Gonzalez-Posadas, a native and citizen of Honduras, unlawfully entered the United States on September 28, 2012. He was apprehended that same day by agents of the United States Department of Homeland Security ("DHS") and found to be inadmissible under 8 U.S.C. § 1182(a)(7)(A)(i)(I).  He was therefore removed from the United States on October 26, 2012.  On February 21, 2013, he unlawfully reentered the United States, and, a week later, was again apprehended by DHS, which issued a "Notice of Intent/Decision to Reinstate Prior Order."  That Notice referred to Gonzalez-Posadas's earlier order of removal and constituted the first step toward again sending him back to his home country.  In response, Gonzalez-Posadas expressed a fear of returning to Honduras. Soon after, the Asylum Office of the United States Citizenship and Immigration Services ("USCIS") interviewed him.

### A.  Interview with USCIS

Gonzalez-Posadas told the USCIS interviewer that he had fled Honduras for two reasons.  First, he reported that a gang called the "Maras"[1] wanted to kill him.  He told USCIS that he had been extorted by the Maras several times in Honduras because they believed that his sister in the United

---

[1] The "Mara Salvatrucha" – also known as "Maras" or "MS-13" – is a criminal gang that reportedly operates in Honduras and other Central American countries.  (*See* A.R. at 230 (identifying the gang as "Mara Salvatrucha" or "MS-13"); *id.* at 248 (identifying the "Maras" as the "MS-13" gang).)

3

States had sent him money. He said that the gang had never physically harmed him but on one occasion some gang members confronted him with a weapon, demanded 1,500 Lempira,[2] and told him that they were going to kill him if he did not pay them within five days. He acknowledged, however, that he did not pay them and nothing happened to him the next time he saw them. The gang also attempted to recruit him and his cousin, but Gonzalez-Posadas refused to join. When asked if he had ever gone to the police to report the Maras, Gonzalez-Posadas said he had done so but that his efforts to get help were fruitless because the police told him that they "didn't have enough proof" (A.R. at 249-50), evidently meaning there was insufficient proof to pursue his particular complaint.

The second reason Gonzalez-Posadas gave for fleeing Honduras was that his family mistreated him because they believed he was gay. He told the interviewer that he is not gay but that people believed him to be gay. When asked if he had ever been subjected to torture, he responded that he had because his family "humiliated" him by using homophobic slurs. (*Id*. at 249-51.) Gonzalez-Posadas also stated that one of his cousins was tied up and raped by his father for being gay. In addition, Gonzalez-Posadas said he was twice raped as a teenager by his cousin Felipe but never told anyone about the rapes because Felipe threatened to hurt his mother if he reported them. When asked if he had any reason to fear the Honduran authorities, he replied, "No." (*Id*. at 252.)

---

[2] The Lempira is the currency of Honduras and, during the relevant time period, 1,500 lempira was worth approximately 78 U.S. dollars.

4

USCIS determined that Gonzalez-Posadas had established a reasonable fear of persecution in Honduras and referred his case for a hearing before an immigration judge ("IJ").

### B. Application for Withholding of Removal and Protection

Because asylum is not available to aliens who face reinstatement of a prior order of removal, 8 U.S.C. § 1231(a)(5), Gonzalez-Posadas could not seek asylum, but he did submit an application for withholding of removal and protection under the Convention Against Torture ("CAT").

In his application, he described the pattern of extortion and repeated attempts at recruitment to which he said the Maras subjected him. He also said the Maras approached two of his cousins, Herlindo Hernandez and Marvin Hernandez, and made similar attempts to lure them into joining the gang. When the two refused, the gang allegedly attacked Herlindo with machetes. Gonzalez-Posadas stated that, soon after attacking Herlindo, the Maras also tried to attack him with machetes, but he was able to hide for a few hours until they left. He claimed that an attempt to get law enforcement to intervene was useless because the police were "corrupt and weak" and did nothing. (A.R. at 230.) He further claimed that he feared torture and death because he had refused to join the Maras, had reported them to the police, and was on their "kill" list.

Gonzalez-Posadas went on in his application to say that he feared rape, torture, and death because he had been "repeatedly raped" by his cousin Felipe, whom he identified

5

as a member of the Maras and who called him "gay," "trash," a "fag," and "worth nothing." (*Id*. at 223, 230.) In addition, he said that other family members discriminated against him because of their perception of his sexual orientation.

Finally, Gonzalez-Posadas stated that, after his first removal from the United States and return to Honduras, the Maras' threats worsened, which led to his second effort to enter the United States. He said that, three days after he left Honduras, the Maras shot and killed his cousin Marvin for refusing to join the gang, for being related to Gonzalez-Posadas who also refused to join the gang, and in retaliation for Gonzalez-Posadas's decision to report the gang to the police.

## C.  Proceedings Before the IJ

The application for withholding of removal and protection under CAT that Gonzalez-Posadas filed became the basis for a hearing before an IJ. At that hearing, when asked on direct examination what his sexual orientation was, Gonzalez-Posadas replied, "I'm gay." (*Id*. at 115.) When asked if he had ever been subjected to any harsh treatment because of being gay, Gonzalez-Posadas replied, "Yes." (*Id*. at 116.) Gonzalez-Posadas then described his first forced sexual encounter with Felipe, stating that, when Felipe raped him, he first beat him and threatened him with a knife. Because Felipe told Gonzalez-Posadas that he would kill him and his mother if he reported the rape, Gonzalez-Posadas kept silent about it. Gonzalez-Posadas testified that Felipe raped him again a second time, after beating him and threatening him with a pistol, and Felipe again threatened to kill him if he told anyone about the rape. Gonzalez-Posadas testified that,

6

in spite of the threats, he eventually reported the second rape to the police some three years later.

Gonzalez-Posadas also testified that the Maras mistreated him by using homophobic slurs, and they threatened to kill him if he did not pay them. He said that gang members would tell him that he had to perform oral sex on them, though he never did. He also described in detail an incident when the Maras attempted to recruit and extort him. Some time after his mother died, eight armed Maras showed up at his house, beat him, and demanded that he join their gang. When he refused to join, they told him that he had to pay them 1,500 Lempira on the fifth of each month or else they would kill him. He attempted to escape the gang by moving to a different part of Honduras, but the gang found him after two weeks and threatened to kill him if he did not submit to the extortion. He testified that he went to the police in November 2012 to report the Maras but was told that he did not have enough proof to initiate an arrest against any members of the gang.

In his testimony, Gonzalez-Posadas gave more detail about his sexual orientation than he had earlier. He stated that people had noted his effeminate nature since his childhood. He said that when he was 18, he had a homosexual relationship with a friend. He also testified about his decision to attend a beauty academy, saying that it had always been his desire to become a beautician but that pursuing his career had fueled the homophobic abuse he experienced, including from members of his family. When asked why he had not told the USCIS interviewer that he was gay, he said that the interview had taken place too quickly

and that he did not feel comfortable disclosing that to the interviewer.

Finally, Gonzalez-Posadas testified that he fled to the United States and feared returning to Honduras because of the Maras and his cousin, and that the Maras knew he had reported them to the police. Gonzalez-Posadas stated that he feared he would be abused if he were returned to Honduras because the gang has a significant presence throughout the country. He said, "When they find out that I'm gay I'm afraid that they may want to rape me again."[3] (A.R. at 141.)

On cross examination, Gonzalez-Posadas testified that he never told anyone that Felipe had raped him on either occasion, and that he did not know that Felipe was a member of the Maras until two years after the second attack. Gonzalez-Posadas also stated that, during the incident with the Maras at his home, he was beaten, threatened with a gun, and subjected to homophobic slurs. He admitted that he was not seriously hurt during the incident and that the gang did not try to recruit him, though they told him that he had to pay them money or else sell drugs for them. Gonzalez-Posadas also said that gang members (presumably excluding Felipe) never sexually assaulted him in any way; instead, they "just [made] threats" with sexual overtones. (A.R. at 151.) Gonzalez-Posadas stated that he was harassed by the Maras on twenty to thirty occasions.

---

[3] The use of the word "again" in that testimony is somewhat contradictory since Gonzalez-Posadas also stated that gang members had not sexually assaulted him. Perhaps, however, it was a reference to Felipe, who, according to Gonzalez-Posadas, is a member of the gang.

On cross examination, Gonzalez-Posadas also provided new details about his visit to the police in November 2012. During that visit, he allegedly complained about numerous past instances of harm that he had experienced at the hands of the Maras. But instead of helping him, the police told him not only that he did not have enough proof, but also that he was lying to them, and one officer took Gonzalez-Posadas's written declaration and threw it in the garbage. When asked why he had not shared those details in his application, Gonzalez-Posadas said that no one had asked him questions that called for them. Finally, he testified that the police did not use any homophobic slurs or say anything about his sexuality.

Along with his testimony, Gonzalez-Posadas submitted documentary evidence for the IJ's consideration. He offered a 2012 State Department Country Report on Honduras, which noted that problems in Honduras included an "arbitrary" police force; a "corrupt[] and institutional[ly] weak[] justice system;" and violence and widespread discrimination against lesbian, gay, bisexual, and transgender ("LGBT") persons. (A.R. at 182, 193-94, 200.) Gonzalez-Posadas also submitted a 2013 Human Rights Watch Report, which stated that, according to local human rights advocates, approximately 70 LGBT persons had been killed between September 2008 and March 2012, and that Honduran police were allegedly involved in some of those deaths. The 2013 Human Rights Watch Report and the 2012 State Department Country Report disclosed, however, that the government had established a special victims unit in the attorney general's office to investigate certain crimes against LGBT persons and other vulnerable groups. Gonzalez-Posadas further submitted a 2011 Amnesty International Report on Honduras in which

9

members of the LGBT community complained that they are subjected to threats and violence and that their reports to the police rarely yield results.

Gonzalez-Posadas also proffered a March 20, 2013 homicide report confirming that his cousin Marvin died from gunshot wounds. In addition, he provided the affidavit of a woman who stated that she had known Gonzalez-Posadas since he moved away from his mother's home to escape the Maras and that he continued to suffer threats, extortion, and homophobic harassment. She also said that Marvin Hernandez was murdered by gang members and that the perpetrators were still free. Finally, Gonzalez-Posadas submitted a translation of several questions and answers he had written, dated August 15, 2013, in which he described his profession, stating that it is uncommon for men in Honduras to work as hair stylists and cosmetologists and that men in that line of work are often harmed because of animus directed at them due to perceptions about their sexual orientation. He said that people discriminated against him and used homophobic slurs because of his career choice. Gonzalez-Posadas stated in the document that he had never been attracted to females or had sex with a woman, but that he once had homosexual feelings for a male friend.

Concluding that Gonzalez-Posadas's credibility was suspect for two reasons, the IJ denied his application for withholding of removal and protection under the CAT. First, the IJ noted that Gonzalez-Posadas's narrative had evolved over time – with additional self-serving, specific details appearing in three successive amendments to his application and then in his live testimony. Second, the IJ decided that Gonzalez-Posadas's direct testimony was not consistent with

10

his application or with his cross-examination testimony, particularly his testimony regarding his November 2012 interaction with the police.

Regarding withholding of removal, the IJ accepted Gonzalez-Posadas's assertion that he was a member of the social group consisting of homosexual males, but concluded that the events complained of, namely two unreported rapes, extortion by the Maras, and exposure to homophobic slurs, were insufficient to establish past persecution or a risk of future persecution on account of sexual orientation. The IJ also held that the second social group in which Gonzalez-Posadas alleged he was a member – namely, "young Honduran men who share experiences of repeated resistance to gang recruitment" – was not cognizable because it did not exist independent of the alleged persecution. (*Id.* at 78-80.) Regarding protection under the CAT, the IJ determined that Gonzalez-Posadas did not express fear of torture by the Honduran government or fear that the Honduran government would acquiesce in his torture, and that any such claim would be speculative.

### D.    Appeal to the Board

Gonzalez-Posadas appealed the IJ's decision, and the Board dismissed the appeal. It concluded that the IJ had not committed clear error in deciding that Gonzalez-Posadas was not persecuted on account of his homosexuality. More particularly, it concluded that the two unreported rapes did not constitute past persecution and that Gonzalez-Posadas had failed to show a clear probability that he would be persecuted in the future on account of his homosexuality. The Board also decided that the IJ was correct in holding that the

11

proposed social group of "'young Honduran men who have resisted gang recruitment'" does not have the requisite social distinction to qualify as a particular social group within the meaning of the operative statute. (*Id*. at 5.) But, the Board held, even if that proposed group were cognizable, Gonzalez-Posadas had not demonstrated the required nexus between the harm he feared and his status within that group. Finally, the Board agreed that any sincere fear of harm or torture harbored by Gonzales-Posadas was speculative and that he had not established government consent or acquiescence in any past torture or the likelihood of it in the future.

Gonzalez-Posadas timely filed the present petition challenging the Board's decision.[4]

---

[4] Gonzalez-Posadas did not seek a stay of removal and was removed from the United States on March 28, 2014.

## II.    Discussion[5]

Gonzalez-Posadas does not challenge the portion of the Board's holding affirming that the group consisting of "young Honduran men who have resisted gang recruitment" is not a cognizable social group for purposes of withholding of removal.  He also does not challenge the Board's denial of his application for protection under the CAT.  Instead, he advances two primary arguments in his petition for review.  First, he says that the Board erred in upholding the IJ's conclusion that he did not establish past persecution on account of his membership in a social group consisting of homosexual males.  Second, he argues that the Board erred in upholding the IJ's conclusion that he did not establish a fear of future persecution on account of his sexual orientation.  We address each of those arguments below.

---

[5]  The Board had jurisdiction under 8 U.S.C. § 1103(g)(2) and 8 C.F.R. § 1208.31(e).  We have jurisdiction to review final orders of the Board pursuant to 8 U.S.C. § 1252.  When the Board relies on an IJ's legal conclusions and findings of fact, we review the IJ's decision and the Board's decision.  *Sandie v. Att'y Gen.*, 562 F.3d 246, 250 (3d Cir. 2009).  We must accept factual findings if supported by substantial evidence.  *INS v. Elias-Zacarias*, 502 U.S. 478, 481 (1992).  Under that deferential standard, we must uphold the agency's determination unless the evidence would compel any reasonable fact finder to reach a contrary result.  8 U.S.C. § 1252(b)(4)(B);  *Elias-Zacarias*, 502 U.S. at 481 n.1; *Abdille v. Ashcroft*, 242 F.3d 477, 483-84 (3d Cir. 2001).  Gonzalez-Posadas argues that he remains eligible for withholding of removal despite his removal from the United States, and the government agrees.

13

## A. Past Persecution

Under section 241(b)(3)(A) of the Immigration and Nationality Act, "[t]he Attorney General may not remove an alien to a country if the Attorney General decides that the alien's life or freedom would be threatened in that country because of the alien's race, religion, nationality, membership in a particular social group or political opinion." 8 U.S.C. § 1231(b)(3)(A). The alien bears the burden of proving that he will more likely than not face persecution on account of one of those protected grounds. *INS v. Stevic*, 467 U.S. 407, 429-30 (1984); *Senathirajah v. INS*, 157 F.3d 210, 215 (3d Cir. 1998) ("To meet this test, the alien must demonstrate that there is a greater-than-fifty-percent chance of persecution upon his or her return."). Proof of past persecution raises a rebuttable presumption that the alien's life or freedom would be threatened in the future. 8 C.F.R. § 1208.16(b)(1)(i). Under our cases, "'persecution' is an extreme concept that does not include every sort of treatment our society regards as offensive." *Fatin v. INS*, 12 F.3d 1233, 1243 (3d Cir. 1993) ("[P]ersecution does not encompass all treatment that our society regards as unfair, unjust, or even unlawful or unconstitutional."). Rather, "persecution" encompasses only grave harms such as "threats to life, confinement, torture, and economic restrictions so severe that they constitute a threat to life or freedom." *Id*. at 1240.

To establish eligibility for withholding of removal based on membership in a particular social group, an applicant must establish both that the group itself is properly cognizable as a "social group" within the meaning of the statute, and that his membership in the group is "one central reason" why he was or will be targeted for persecution.

14

*Matter of C-T-L-*, 25 I. & N. Dec. 341, 344-46 (BIA 2010) (extending the "one central reason" standard from asylum cases to cases involving withholding of removal).[6]  We are

[6] While the parties appear to agree on this point, we have not heretofore addressed whether the Board's decision in *Matter of C-T-L-* properly extended the "one central reason" test to determinations of withholding of removal. Subsection 101(c) of the REAL ID Act amends section 241(b)(3) of the INA by applying to and codifying for withholding of removal the same standards for sustaining the applicable burden of proof in terms of corroboration and credibility that are used for asylum adjudications under sections 208(b)(1)(B)(ii) and (iii) of the INA, as amended by section 101(a)(3) of the REAL ID Act.  REAL ID Act of 2005, Pub. L. No. 109-13, § 101(a)(3), 119 Stat. 231 (codified at 8 U.S.C. § 1158(b)(1)(B)); *id.* at § 101(c) (codified at 8 U.S.C. § 1231(b)(3)(C)).  Prior to passage of the REAL ID Act in 2005, there was no statutory standard for judging whether an alien should be granted asylum when he was persecuted on account of both protected and unprotected grounds.  As a result, the Board and the courts formulated various "mixed motive" persecution tests, with this Court providing that an applicant needed only to show that his persecution was caused "at least in part" by membership in a protected group.  *Ndayshimiye v. Att'y Gen.*, 557 F.3d 124, 129 (3d Cir. 2009) (internal quotation marks omitted); *see also Matter of C-T-L-*, 25 I. & N. Dec. at 345-46 (discussing the various tests developed prior to the REAL ID Act).  The REAL ID Act supplanted that standard, requiring instead that an asylum applicant establish that membership in a particular social group "was or will be at least *one central reason* for persecuting the applicant."  8 U.S.C. § 1158(b)(1)(B)(i)

not free to assume that past persecution was perpetrated on account of a protected characteristic, such as membership in a particular social group. *See INS v. Elias-Zacarias*, 502 U.S. 478, 483 (1992) (stating that evidence of a persecutor's motives is required). Rather, the applicant bears the burden of proving that one central reason for the persecution was a protected characteristic. *Matter of C-T-L-*, 25 I. & N. Dec. at 350. For a protected characteristic to qualify as "one central reason", it must be an essential or principal reason for the persecution; withholding of removal may not be granted when the characteristic at issue "played only an incidental, tangential, or superficial role in persecution." *Ndayshimiye v. Att'y Gen.*, 557 F.3d 124, 130 (3d Cir. 2009) (discussing asylum). Conflicts of a personal nature and isolated criminal acts do not constitute persecution on account of a protected characteristic. *See Shehu v. Att'y Gen.*, 482 F.3d 652, 657 (3d Cir. 2007) (concluding that no reasonable fear of persecution existed when gang targeted the applicant for economic gain, not because of his political or family affiliation); *Amanfi v. Ashcroft*, 328 F.3d 719, 727 (3d Cir. 2003) (finding no

---

(emphasis added). But the REAL ID Act did not expressly state whether the "one central reason" test should apply in the context of withholding of removal. We believe that the Board's decision in *Matter of C-T-L-* to extend the "one central reason" test to withholding of removal was sound and we likewise adopt that conclusion now. In particular, we agree that "'the language and design of the statute' evidences" Congress's intent to eliminate the confusion and disparity inherent in the "mixed motive" persecution tests in the context of both claims for asylum and claims for withholding of removal. *Matter of C-T-L-*, 25 I. & N. Dec. at 348.

16

reasonable fear of persecution on account of the applicant's religion when past conflict was motivated by an interpersonal conflict and not by religious bigotry); *see also Marquez v. INS*, 105 F.3d 374, 380 (7th Cir. 1997) ("A personal dispute, no matter how nasty, cannot support an alien's claim of asylum.").

The IJ and the Board held – and the government does not dispute – that Gonzalez-Posadas's sexual orientation placed him in a cognizable social group. But the IJ concluded, and the Board agreed, that Gonzalez-Posadas failed to establish past persecution because he failed to demonstrate that he was persecuted on account of his sexual orientation.[7] We must determine whether substantial evidence supports that conclusion.

Gonzalez-Posadas argues that he has shown he suffered "one or more incidents of persecution at the hands of homophobic [Mara] gang members on account of his sexual orientation." (Gonzalez-Posadas Br. at 10.) He asserts that, because he credibly testified that gang members called him "dog," "garbage," "faggot," and told him that he "should be dead" and that he "should not exist in this society," he proved that his sexual orientation was one central reason for his persecution. (Gonzalez-Posadas Br. at 15 (internal quotation marks omitted); A.R. at 122.) He also points to other

---

[7] As noted by the government, the IJ appears to have conflated whether Gonzalez-Posadas had established that the mistreatment he suffered rose to the level of persecution with whether he was mistreated on account of his sexual orientation. We will assume, without deciding, that the mistreatment rose to the level of persecution.

17

testimony which he believes resolves the issue in his favor: the Maras "'would mistreat [him], they would beat [him] up – they said they would kill [him] if it wasn't because [he] was paying them money – that someone like [him] should be dead.'" (Gonzalez-Posadas Br. at 15 (alterations in original) (quoting A.R. at 124).)

The problem with Gonzalez-Posadas's argument is that it relies on a narrow and naturally one-sided interpretation of the record. Despite the picture he paints, substantial evidence in the record – including his own prior statements – can be understood to show that the Maras were interested in him for two reasons: he had money, and he was a potential recruit. For instance, when asked point-blank by the USCIS interviewer why the Maras threatened to harm him, Gonzalez-Posadas responded, "Because they wanted to steal from me." (A.R. at 247.) In his application for withholding of removal, he stated, "[M]y mother and I were targets of extortion by the [Maras]" because the gang believed that the two of them received money from his sister in the United States. (A.R. at 230.) He further stated that he feared death and torture at the hands of the Maras because he had refused to join their gang, he had reported them to the police, and he had attempted to escape from them. At no point in the application did Gonzalez-Posadas suggest that the gang had any interest in harming him on account of his homosexuality.

To further underscore the point, when he testified about his interaction with the Maras when they first began extorting him, he did not claim that any reference to his sexual orientation was made; the Maras only expressed interest in his money. In addition, he testified that the Maras also used intimidation and violence in their attempt to coerce

18

his cousins to join the gang. He did not testify that either of those cousins was gay, which suggests that the Maras' interest in recruiting young men, including Gonzalez-Posadas, had nothing to do with sexual orientation. While it may certainly be true that the Maras used homophobic slurs and sexual threats when addressing Gonzalez-Posadas, the record can support the conclusion that the abusive language was a means to an end – namely cowing Gonzalez-Posadas into paying them off or joining their gang.

Gonzalez-Posadas focuses in his briefing on the actions of the Maras. Our analysis has in turn focused on the Maras' acts. To the extent Gonzalez-Posadas has not abandoned reliance on the rapes committed by his cousin, however, we conclude that, heinous though those crimes were, the conclusion of the IJ that they were "isolated criminal acts" that were not motivated by Gonzalez-Posadas's homosexuality is supported by substantial evidence. (A.R. at 77.) They are therefore not a basis for a finding of past persecution. *See Abdille v. Ashcroft*, 242 F.3d 477, 494 (3d Cir. 2001) ("The assaults experienced by Abdille at the hands of two different sets of assailants could represent random street violence, motivated not by animosity against a particular ethnic group, but rather by arbitrary hostility or by a desire to reap financial rewards. Such ordinary criminal activity does not rise to the level of persecution necessary to establish eligibility for asylum."); *see also Singh v. INS*, 134 F.3d 962, 967 (9th Cir. 1998) ("Mere generalized lawlessness and violence between diverse populations, of the sort which abounds in numerous countries and inflicts misery upon millions of innocent people daily around the world, generally is not sufficient" to establish past persecution).

In short, while other interpretations of the record are certainly possible, substantial evidence supports the agency's determination that Gonzalez-Posadas's homosexuality was not one central reason for the persecution.

## B.     Fear of Future Persecution

Even if an applicant fails to prove that he suffered past persecution, he can still establish that "it is more likely than not that he … would be persecuted" in the future on account of a protected characteristic if he were removed.  8 C.F.R. § 1208.16(b)(2); *Miah v. Ashcroft*, 346 F.3d 434, 439 (3d Cir. 2003).    An applicant for withholding of removal may demonstrate a sufficient threat of future persecution by showing either that it is more likely than not that he will be "singled out individually" for persecution on account of a protected basis, or that "there is a pattern or practice of persecution of a group of persons similarly situated" to him on account of a protected basis, and that he is a member of that group, and that his life or freedom would be more likely than not be threatened if he were removed.   8 C.F.R. § 1208.16(b)(2)(i), (ii).  To qualify as a "pattern or practice" for purposes of withholding of removal, the persecution must be "systematic, pervasive, or organized."[8]   *See Lie v. Ashcroft*, 396 F.3d 530, 537 (3d Cir. 2005) (interpreting "pattern or practice" in asylum regulations).

---

[8] Because the regulatory language that *Lie* interpreted is nearly identical in both the asylum and withholding of removal contexts, we conclude that the test set forth for proving "pattern or practice" in the asylum context also applies to proof supporting withholding of removal.

Gonzalez-Posadas argues that "[t]he record demonstrates … [he] suffered homophobic mistreatment that will likely continue to worsen in the future such that it will rise to the level of persecution." (Gonzalez-Posadas Br. at 17.) He asserts that his own experiences bear out the cogency of his argument: "[h]e was raped with a knife held to his neck, called a faggot 20-30 times, extorted for money at gunpoint, beaten and threatened with death," all allegedly because he was perceived as gay. (*Id*.) He also asserts that the mistreatment directed at him is likely to intensify because he is older than he was when he was previously mistreated and because he is now an uncloseted gay man. Further, relying on the documentary evidence presented to the IJ, he asserts that conditions in Honduras validate his fear of future persecution and establish that it is more likely than not that he will face future persecution in Honduras based on his sexual orientation.

Viewing the entirety of the record, however, we are bound to say that the agency's determination that Gonzalez-Posadas failed to establish that it was more likely than not he would be subjected to future persecution is supported by substantial evidence. First, as we have already discussed, Gonzalez-Posadas did not establish that the Maras targeted him on account of his sexual orientation, nor did he show that the rapes he suffered by his cousin were related to his (Gonzalez-Posadas's) sexual orientation. Second, as to the documentary evidence of country conditions in Honduras, we cannot agree that the evidence compels the conclusion that Gonzalez-Posadas is more likely than not to suffer persecution on account of his sexual orientation, especially in light of the statements in the 2013 Human Rights Watch Report that the Honduran government has established a

21

special unit in the attorney general's office to investigate crimes against LGBT persons and other vulnerable groups. While the documentary evidence does demonstrate that LGBT persons may face violence at the hands of their fellow Honduran citizens and suffer indignities and discrimination, the record does not compel the conclusion that there is a "systematic, pervasive, or organized" pattern or practice of persecution of LGBT persons in Honduras. Again, there is more than one way to view the record before us, but we are required to uphold the decision of the Board when there is, as in this case, substantial evidence to support it. 8 U.S.C. § 1252(b)(4)(B); *Elias-Zacarias*, 502 U.S. at 481.

## III.  Conclusion

Accordingly, for the reasons stated, we will deny the petition for review.