**NOT PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

_____

No. 16-3921

_____

TEODORO ALFREDO REYES AGUILAR;
ANA VICTORIA RAMOS DE REYES;
ALFREDO RAFAEL REYES-RAMOS;
ASTRID ABIGAIL REYES-RAMOS,
                                        Petitioners

v.

ATTORNEY GENERAL UNITED STATES OF AMERICA,
                                        Respondent

_____

On Petition for Review of Order
of the Board of Immigration Appeals
(B.I.A. Nos. A087-772-293, A087-772-287, A087-772-288, A087-772-291)

_____

Submitted Under Third Circuit L.A.R. 34.1(a)
April 28, 2017

_____

Before:  McKEE, VANASKIE, and RENDELL, *Circuit Judges*

(Opinion Filed:  August 16, 2017)

_____

OPINION*

_____

_____

    * This disposition is not an opinion of the full Court and pursuant to I.O.P. 5.7
does not constitute binding precedent.

VANASKIE, *Circuit Judge.*

Petitioner Teodoro Reyes Aguilar and his family entered the United States illegally, and he was ordered removed soon after. Aguilar then filed an application for asylum, withholding of removal, and protection under the Convention Against Torture alleging that he had been subject to past persecution in El Salvador and maintains a well-founded fear of future persecution.[1] Aguilar testified that he and his family had fled El Salvador after being threatened and extorted by members of the violent Mara Salvatrucha gang. While Aguilar admitted that the gang members had initially targeted him because he was a business owner, he argued that the gang members developed a mixed motive for their persecution after he made derogatory remarks about them to the owners of neighboring businesses. An Immigration Judge ("IJ") and later the Board of Immigration Appeals ("BIA") rejected this mixed motive theory, finding that Aguilar had failed to demonstrate that the gang members' actions were motivated by a protected ground under the Immigration and Naturalization Act, rather than by their own pecuniary gain. Upon review, we find that Aguilar's credited testimony supports his allegation that the gang members were motivated at least in part by his statements. Accordingly, we will vacate and remand to the BIA to assess whether this motivation is a protected ground under the INA such that Aguilar may be eligible for asylum or withholding of removal.

---

[1] Aguilar is lead petitioner, and his wife and children are derivatives on his application.

2

# I.

Teodoro Reyes Aguilar and his family are native citizens of El Salvador. Prior to leaving their country, Aguilar owned a car-importing business and his wife owned a small factory. One day, Aguilar was approached by several members of the Mara Salvatrucha (MS) gang who demanded that Aguilar pay them $50 each week. They warned him to keep silent about the arrangement or they would kill him. Aguilar began making these extortionate payments, but expressed his displeasure to neighboring business owners, calling the MS members "parasites of the society" that "should be exterminated," and opining that "something like the Sombra Negra should exist to do this."[2] (A.R. 170–71.) Less than a week after making these remarks, members of the gang increased their demand to $100 dollars a week because they "heard [Aguilar] talked badly about [them]." (A.R. 171.) They also threatened to kill his family if he did not pay. (*Id.*)

Aguilar continued to pay the $100 a week for several months, but then decided to leave for the United States until the situation calmed down. He entered the United States on a visa, and his wife entered by land with the help of a smuggler. His children remained in El Salvador with his sister-in-law.

Aguilar and his wife eventually returned to El Salvador. Shortly after arriving, Aguilar was approached by three MS members while he was in his car. They threatened him at gunpoint and demanded he resume his $100 weekly payments. The gang

---

[2] The Sombra Negra is a vigilante group in El Salvador that targets criminals and gang members.

3

members also told him that they knew the whereabouts of his family and where his son goes to school. Several days later, Aguilar awoke with facial paralysis for which he sought medical treatment; Aguilar believes the condition was caused by stress he suffered due to the run in with the gang. After a few months had passed, the MS members dramatically increased their demand to $500. Aguilar asked them for the weekend to come up with the money. Instead of paying, he immediately fled to the United States with his family in tow.

Aguilar entered the United States unlawfully in December 2009. Shortly thereafter, the Department of Homeland Security initiated removal proceedings against him. Aguilar was charged with removability under INA § 212(a)(6)(A)(i), 8 U.S.C. § 1182(a)(6)(A)(i), as an alien present in the United States without being admitted or paroled. In May 2010, he appeared before the Immigration Court with counsel, and conceded that he was removable as charged.

In August 2010, Aguilar filed an application for asylum, withholding of removal, and protection under the United Nations Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment ("CAT"). He later submitted a revised application in December 2011. His petition noted that he was seeking asylum and withholding of removal based on political opinion, membership in a particular social group, and the "Torture Convention." (A.R. 406.) In Aguilar's first pre-hearing statement, he explained that he is a member of the particular social group of "people who are adverse to gangs and their practices." (A.R. 576.) He also asserted that his anti-gang sentiment qualified as a political opinion recognized as a ground for seeking asylum.

4

(*Id.*)  In a second statement, Aguilar asserted that he was a member of a social group defined as "those who have fled from the Mara Salvatrucha."  (A.R. 540.)

A hearing was held before an IJ during which Aguilar testified.  Although the IJ concluded that Aguilar was a credible witness, she determined that Aguilar had not demonstrated the past persecution or well-founded fear of future persecution on account of a protected ground required to obtain asylum.  (A.R. 121–22.)  With regard to past persecution, the IJ found that the threats and extortion from MS were motivated by their pecuniary interest or personal animus rather than Aguilar's political opinion or other protected ground and thus were not "persecution" within the meaning of the Act.  The IJ further extrapolated that any fear of future extortion or physical harm by MS was similarly motivated.  Even so, IJ explained that Aguilar's criticism of MS was not made in a political context and his two posited social group formulations were not sufficiently particular or socially distinct in El Salvador.  (A.R. 122 n.3.)  Because Aguilar did not meet his burden for asylum, the IJ determined that he would not meet the more onerous burden in order to be eligible for withholding of removal.  Additionally, the IJ found Aguilar to be ineligible for CAT protection because he did not show that he would more likely than not be tortured if he was removed to El Salvador.

Aguilar appealed the IJ's order to the BIA, which subsequently affirmed.  First, the BIA found no clear error in the IJ's holding that Aguilar had failed to establish past persecution or a well-founded fear of future persecution in El Salvador on account of a protected ground under the INA.  (App. 10.)  Aguilar had testified that he was initially targeted for extortion because he was a business owner, and while he argued that MS had

5

developed a mixed motive when it increased its extortion demands after hearing of his derogatory statements, the BIA agreed with the IJ's findings that Aguilar's criticism of MS was not made in a political context and that Aguilar did not show that his extortion payments were increased because of his statements rather than due to selfish pecuniary interests or personal animus from his unfavorable remarks. The BIA pointed to Aguilar's testimony that MS continued to ask him for money over the years because he was a business owner. (App. 10; A.R. 208.) As such, the BIA declined to reach the issue of whether Aguilar's proposed particular social groups were sufficiently particular or socially distinct. The BIA also affirmed the IJ's determination that Aguilar had not established a well-founded fear of future persecution and that CAT would not apply because Aguilar had not established that torture would be inflicted with the consent or acquiescence of a public official or one acting in an official capacity.

Aguilar has now appealed the ruling of the BIA.

## II.

The BIA's jurisdiction arose under 8 C.F.R. §§ 1003.1(b)(3) and 1240.15. We have jurisdiction to review final orders of the BIA pursuant to 8 U.S.C. § 1252. When the BIA relies on an IJ's legal conclusions and findings of fact, we review both the IJ's decision and BIA's decision. *Sesay v. Att'y Gen.*, 787 F.3d 215, 220 (3d Cir. 2015). "[W]e 'accept factual findings if supported by substantial evidence,' a deferential standard under which we 'uphold the agency's determination unless the evidence would compel any reasonable fact finder to reach a contrary result.'" *Id.* (quoting *Gonzales-*

*Posadas v. Att'y Gen.*, 781 F.3d 677, 684 n.5 (3d Cir. 2015)). We review the BIA's legal determinations *de novo*, subject to the principles of *Chevron* deference. *Id.*

Aguilar appeals the BIA's decision upholding the denial of his application for asylum, withholding of removal, and CAT protection. An alien seeking asylum under the Immigration and Nationality Act (INA) "must demonstrate either (i) proof of past persecution, or (ii) a well-founded fear of future persecution in his home country on account of race, religion, nationality, membership in a particular social group, or political opinion." *Id.* at 218–19 (quoting 8 U.S.C. § 1101(a)(42)). Compared to asylum, an application for withholding of removal "is reviewed under a more stringent standard": "an alien 'must establish a clear probability, that is, that it is more likely than not that [his] life or freedom would be threatened if returned to [his] country' because of his protected class." *Id.* at 219 (alteration in original) (quoting *Kaita v. Att'y Gen.*, 522 F.3d 288, 296 (3d Cir. 2008)). Under CAT, the applicant "bears the burden of establishing 'that it is more likely than not that he or she would be tortured if removed to the proposed country of removal.'" *Sevoian v. Ashcroft*, 290 F.3d 166, 174–75 (3d Cir. 2002) (quoting 8 C.F.R. § 208.16(c)(2)). Torture requires that pain or suffering be "inflicted by or at the instigation of or with the consent or acquiescence of a public official or other person acting in an official capacity." 8 C.F.R. § 208.18(a)(1).

**A.**

As an initial matter, the Government argues that Aguilar waived his challenge to the BIA's decision by failing to cite directly to the record to support his arguments. The Federal Rules of Appellate Procedure specify that an appellant's brief must contain his

"contentions and the reasons for them, with citations to the authorities and parts of the record on which the appellant relies." Fed. R. App. P. 28(a)(8)(A). Our Local Rules further state, "All assertions of fact in briefs must be supported by a specific reference to the record." 3d Cir. L.A.R. 28.3(c) (2011).

While Aguilar does not cite to the record in his brief, it is clear which facts he is referencing, and we have the entirety of the record in front of us. Unlike the bulk of the cases the Government highlights, Aguilar otherwise appropriately cited to legal authority to support his arguments. In this instance, we do not deem his failure to provide precise record citations to be sufficient to waive his right to seek review of the BIA's decision, especially where we have conducted an independent review of the administrative record. Instead, we follow the example of the Ninth Circuit in *Quan v. Gonzales*, 428 F.3d 883, 886 (9th Cir. 2005), and admonish counsel to comply with the rules of our Court in the future.

**B.**

We next address the BIA's decision on Aguilar's application for asylum. The BIA correctly observed that "[i]t is well settled that criminal extortion efforts do not constitute persecution on account of a protected ground" under the INA. (App. 10 (citing *Matter of A-M-E- & J-G-U-*, 24 I. & N. Dec. 69, 76 (B.I.A. 2007), *overruled on other grounds*, *Valdiviezo-Galdamez v. Att'y Gen.*, 663 F.3d 582, 600 (3d Cir. 2011)).) On this basis, the IJ determined that the extortionate actions and threats made by MS members were motivated by pecuniary gain rather than by any protected ground under the INA and

8

denied his application for asylum. The BIA affirmed, finding no clear error in that determination.

While Aguilar agrees that the MS gang members initially targeted him because he was a business owner, he argues that the MS gang members increased their extortion demand to $100 per week because of the negative statements he made about the gang to neighboring business owners and his statement in favor of the Sombra Negra group. At that point, Aguilar theorizes, the gang members developed a "mixed motive" because they were targeting him for both pecuniary gain and because of his political opinion or his membership in either the particular social group of persons who have spoken out publicly against the MS or persons who have expressed favor for vigilante organizations—both allegedly falling within protected grounds under the INA. (App. 10; A.R. 114.)

Aguilar's mixed motive persecution theory is not novel. The INA permits relief in instances of mixed motive persecution "as long as the applicant's protected status was at least one of the causes of the persecution." *Ndayshimiye v. Att'y Gen.*, 557 F.3d 124, 129 (3d Cir. 2009). "[A]n applicant need only show that his or her persecution was caused 'at least in part' by membership in a protected group." *Id.* (quoting *Chang v. INS*, 119 F.3d 1055, 1065 (3d Cir. 1997)).

The BIA affirmed the IJ's rejection of this argument, noting that the IJ had found that Aguilar's criticism of MS was not made in a political context, nor had he shown that MS increased its extortion demands because of his statements rather than the gang's pecuniary interests or personal animus flowing from his unfavorable remarks. (App. 10.)

9

The BIA summarizes Aguilar's testimony as follows: "[W]hen asked why he believed the MS kept asking him for money over the years, he testified that they did so because he was a business owner and did not indicate a belief that he was targeted on account of any beliefs, opinions, or actions." (App. 10 (citing A.R. 207–08).) But the relevant part of Aguilar's testimony that is cited by the BIA reads:

> MS. RANSON TO MR. REYES-AGUILAR:
> . . . Why do you think these gang members kept asking you for money?
>
> MR. REYES-AGUILAR TO MS. RANSON:
> You know, because in El Salvador, when they see that you have a business, they just look at you, and they check on you, and then, when they approach you, they know that you have the business.
>
> MS. RANSON TO MR. REYES-AGUILAR:
> So you believe that they came after you because you were a business owner?
>
> MR. REYES-AGUILAR TO MS. RANSON:
> Yeah, that's right.

(A.R. 208.) Nothing in this exchange indicates that Aguilar believed that MS continued asking him for money "over the years" *solely* because he was a business owner or that their motive did not evolve over time. Rather, Aguilar's earlier testimony stated that after he had made his negative statements about MS, "a few days pass, less than a week, when I have them back, and three of them came, and they said, *we heard that you talked badly about us, and because you did that we are going to charge you $100 a week from now on*, and if you don't pay that we are going to kill your family." (A.R. 171 (emphasis added).) In other words, Aguilar testified that the gang specifically cited his statements as the reason why it was increasing his payments. This runs contrary to the BIA's conclusion

10

that his testimony "did not indicate a belief that he was targeted on account of any beliefs, opinions, or actions," (App. 10), and directly supports his mixed motive argument.

Despite affirming the IJ's determination that Aguilar was credible, (App. 10), the BIA failed to acknowledge this important portion of Aguilar's testimony. Instead, both the BIA and IJ determined that Aguilar had failed to show that his increased extortion payments and threats were the result of a protected ground rather than the pecuniary interest or personal animus of MS. However, the BIA has recognized that

> [p]ersecutors may have differing motives for engaging in acts of persecution, some tied to reasons protected under the Act and others not. Proving the actual, exact reason for persecution or feared persecution may be impossible in many cases. An asylum applicant is not obliged to show conclusively why persecution has occurred or may occur.

*In Re S-P-*, 21 I. & N. Dec. 486, 489 (B.I.A. 1996). As such, "an applicant does not bear the unreasonable burden of establishing the exact motivation of a 'persecutor' where different reasons for actions are possible." *Id.*

While we must affirm factual determinations unless the record evidence would compel any reasonable factfinder to conclude to the contrary, Aguilar's credible testimony supports his assertion that the increased payments were, at least in part, the result of his negative statements. Requiring him to show that the MS members were motivated by his membership in the particular social group of persons who have spoken out publicly against the MS and who have expressed favor for vigilante organizations, rather than personal animus because of those statements, would place an unreasonable burden on Aguilar. There is no clear delineation between these two motives, and there is

11

no additional evidence that we can conceive of that would allow Aguilar to hammer down the gang members' precise motivations, short of their testimony. Rather, the immediacy with which the gang increased its demands coupled with its stated reason for the increase leads us to conclude that any reasonable fact finder would hold that Aguilar had demonstrated that the increased demands were at least in part motivated by his statements.

The question now becomes whether Aguilar's statements were a political opinion or if they indicated his membership in a particular social group. The IJ determined that Aguilar's criticism of MS was not made in a political context, and the BIA affirmed. (App. 2, 24 n.3.) However, neither the IJ nor the BIA provided reasoning to support this finding. Similarly, the IJ determined that Aguilar's proposed particular social groups were not sufficiently particular or socially distinct. (App. 24 n.3.) Again, no reasoning was given. The BIA declined to weigh in on the issue because it found that Aguilar had not met his burden of showing a nexus between the persecution and a protected ground. Thus, we will vacate and remand the issue to the BIA to review whether Aguilar's proposed groups are sufficiently particular or distinct, and to provide a more detailed review of whether his statements were a political opinion. Aguilar's application for withholding of removal should similarly be reevaluated in light of our guidance.

Despite our position on the applications for asylum and withholding of removal, we affirm with respect to the Aguilar's eligibility for CAT protection. Nothing in the record indicates that Aguilar suffered harm amounting to "torture," nor is there any

12

indication that he would be in danger of being subjected to torture in the future if he were returned to El Salvador.

## III.

Because Aguilar's mixed-motives argument requires further attention, we will vacate and remand to the BIA for consideration of the issues raised above and potential further remand to the IJ.