**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 18-1342
_____

ADAMU SUMAILA,
                                        Petitioner,

v.

ATTORNEY GENERAL OF THE
UNITED STATES OF AMERICA,
                                        Respondent.
_____

On Petition for Review of an Order of the
Board of Immigration Appeals
(Agency No. A209-390-025)
Immigration Judge:  Leo Finston
_____

Argued:  April 30, 2019
_____

Before:  RESTREPO, ROTH and FISHER, *Circuit Judges*.

(Filed: March 31, 2020)

Adrian N. Roe
First Floor
428 Boulevard of the Allies
Pittsburgh, PA 15219

Paige Beddow [ARGUED]
Scott A. Cain [ARGUED]
(Admitted Pursuant to Third Circuit LAR 46.3)
West Virginia University College of Law
101 Law School Drive
Morgantown, WV 26506

     *Pro Bono Counsel for Petitioner*

Jeffrey R. Meyer
Jonathan K. Ross [ARGUED]
United States Department of Justice
Office of Immigration Litigation
P.O. Box 878
Ben Franklin Station
Washington, DC 20044

     *Counsel for Respondent*

_____

**OPINION OF THE COURT**
_____

RESTREPO, *Circuit Judge*.

Adamu Sumaila fled his home country of Ghana and entered the United States without authorization after his father and neighbors assaulted him and threatened his life when they

discovered that he was in a same-sex relationship. Sumaila seeks asylum and withholding of removal under the Immigration and Nationality Act (INA) and protection from removal under the Convention Against Torture (CAT), because he fears being persecuted or tortured on account of his sexual orientation and identity as a gay man if returned to Ghana – a country that criminalizes same-sex male relationships and has no proven track record of combatting widespread anti-gay violence, harassment and discrimination. The Immigration Judge (IJ) denied Sumaila's application and ordered his removal, and the Board of Immigration Appeals (BIA) affirmed.

Sumaila now petitions this Court for review of the BIA's final decision. He argues that the BIA erred in finding, among others, that he had not suffered past persecution and did not have a well-founded fear of future persecution. For the following reasons, we will vacate the BIA's decision and remand for further proceedings consistent with this opinion.[1]

## I. BACKGROUND

### A. Sumaila's Experience in Ghana

Sumaila was born and raised in Ghana's capital, Accra. He first realized he was gay when he was fourteen years old. He came to this realization after sharing an intimate encounter with another boy, Inusah, whom he had met at Muslim school. One afternoon, the two boys were spending time together in Sumaila's bedroom and, after sharing a toffee that Sumaila had

---

[1] Because we believe this case can be disposed of on the merits of Sumaila's asylum claim, we will not resolve his withholding of removal or CAT claims at this time.

3

bought for Inusah, they had sex for the first time. Over the next twelve years, Sumaila continued to see Inusah but kept their sexual relationship hidden. Being gay in Ghana, Sumaila believed, was simply "not acceptable." JA101. He could not speak to his family about his feelings because he worried that, as Muslims, they would disapprove of his sexual orientation or, even worse, that his father would kill him.

When Sumaila was twenty-six years old, his anxieties materialized into a harsh reality. One morning in January 2016, his father unexpectedly entered Sumaila's bedroom at the break of dawn and discovered Sumaila having sex with Inusah. His father went into a rage and began shouting that "his son was hav[ing] sex with another man," JA215, and called on others to "come, come and witness what my son is up to[!]" JA99 (Tr. 37:20–21). He demanded answers from Sumaila and condemned his actions: "Why do you engage in homosexuality? You have brought shame to this family and I will make sure you face the wrath of this evil deed." JA166.

Upon hearing this uproar, a crowd of neighbors gathered at Sumaila's house, forming a violent mob. Together with his father, the mob began to beat the two young men with stones, wooden sticks, and iron rods, and dragged them into a courtyard. Some in the mob wanted to report the young men to the police, but others began to argue over how best to punish them: death by burning or beheading.

Sumaila believed the death threats were real. He remembers being doused with kerosene, and hearing calls to set him on fire. He also saw someone in the mob brandish a "cutlass," JA215, a curved sword with a sharp edge like a machete. Fearing that his life was in danger, he managed to escape and ran naked, hurt and bleeding to a friend's house

4

about ten minutes away. Sumaila told his friend about the attack and about his sexual relationship with Inusah. His friend, too, became afraid. He worried that they could both be killed if people found out that Sumaila was hiding there.

Too frightened to call the police, seek medical care, Sumaila asked his friend to drive him to neighboring Togo. But Sumaila did not feel safe there either; he was concerned that the Togolese government and people disliked gay men too. Within about two weeks, Sumaila retrieved his passport from his home with his friend's help and arranged to fly from Ghana to Ecuador. Sumaila has heard that his father has publicly disowned him for being gay, that he is still looking for him, and that he intends to kill him if he finds him.

Sumaila still worries about Inusah, his partner of more than ten years. Despite numerous attempts, he has not been able to reconnect with him since that horrific day.

## B. Procedural History

Sumaila eventually found his way to safety in the United States but entered the country without valid documents. Soon after, the Department of Homeland Security began proceedings to remove Sumaila and return him to Ghana. In the course of removal proceedings, Sumaila applied for asylum, among other forms of relief. Sumaila claimed that, after having been violently outed, attacked and threatened by his father and neighbors, he fears that he will be killed or otherwise persecuted in Ghana because he is gay.

The IJ denied Sumaila's application. Although he found portions of Sumaila's testimony to be less credible than others, the IJ declined to make an adverse credibility

5

determination. Still, the IJ concluded that Sumaila had not established "past persecution" or a "well-founded fear of future persecution." JA24-25. Notably, the IJ observed that "there [was] no reason to believe that [Sumaila] would not be able to live a full life, especially if he were to continue to keep his homosexuality a secret." JA25. Sumaila appealed to the BIA.

The BIA affirmed the IJ's decision and dismissed the appeal. Though it credited Sumaila's account as credible, the BIA agreed that Sumaila had not established "past persecution" or a "well-founded fear or clear probability of future persecution." JA14, 15. The BIA "distance[d]" itself from the IJ's observation that Sumaila could live a "full life" if he kept "his homosexuality a secret." JA15.

Sumaila now seeks review of the BIA's decision.[2]

## II. STANDARD OF REVIEW

"[P]ersecution" and "well-founded fear of persecution" are "findings of fact that we review under the deferential substantial evidence standard[.]" *Abdille v. Ashcroft*, 242 F.3d 477, 483 (3d Cir. 2001). "Substantial evidence is more than a mere scintilla and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.* (citation omitted). Under this evidentiary standard, we defer to factual findings "unless any reasonable adjudicator would be compelled to conclude to the contrary." *Espinosa-Cortez v. Att'y Gen. U.S.*, 607 F.3d 101, 106-07 (3d Cir. 2010) (quoting

---

[2] The BIA had jurisdiction under 8 C.F.R. §§ 1003.1(b) and 1240.15. We have jurisdiction under 8 U.S.C. § 1252(a). Sumaila timely petitioned for review. *See* 8 U.S.C. § 1252(b)(1).

8 U.S.C. § 1252(b)(4)(B)); *Balasubramanrim v. I.N.S.*, 143 F.3d 157, 161 (3d Cir. 1998) ("We will uphold the agency's findings of fact to the extent they are 'supported by reasonable, substantial, and probative evidence on the record considered as a whole.'") (quoting *I.N.S. v. Elias-Zacarias,* 502 U.S. 478, 481 (1992)). We accord no deference to factual findings that "are based on inferences or presumptions that are not reasonably grounded in the record." *Dia v. Ashcroft*, 353 F.3d 228, 249 (3d Cir. 2003) (en banc) (quoting *El Moraghy v. Ashcroft*, 331 F.3d 195, 202 (1st Cir. 2003)). If the BIA "mischaracterized and understated the nature of the evidence supporting [an applicant]'s claims," its findings are not supported by substantial evidence. *Chavarria v. Gonzales*, 446 F.3d 508, 517 (3d Cir. 2006).

If factual findings are based on a misunderstanding of the law, we will review the abstract legal determination *de novo*, subject to *Chevron* deference when applicable, to ensure uniformity in the application of the law. *Huang v. Att'y Gen. U.S.*, 620 F.3d 372, 379 (3d Cir. 2010) (citing *Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837 (1984)); *see Ramirez-Peyro v. Holder*, 574 F.3d 893, 899 (8th Cir. 2009) (exercising *de novo* review where the BIA "misunderstood and misapplied the parameters" of the relevant legal standard, "leading [the BIA] to conduct improper factual findings when applying that standard"); *Foroglou v. I.N.S.*, 170 F.3d 68, 70 (1st Cir. 1999) ("The [BIA's] application of the legal standards to specific facts is also entitled to deference," but "[a]bstract rulings of law are subject to *de novo* review.").

When the BIA affirms the IJ's determinations without expressly rejecting any of its findings and only adds its own gloss to the analysis, we may review both the BIA's and the IJ's decisions. *Sandie v. Att'y Gen. U.S.*, 562 F.3d 246, 250

(3d Cir. 2009).

### III.  DISCUSSION

Under the INA, any person who is physically present in the United States, irrespective of his immigration status, may be granted asylum if he is a refugee within the meaning of the statute.  8 U.S.C. § 1158(a)(1), (b)(1).  A refugee is anyone who is unable or unwilling to return to their country of origin "because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion."  *Id*. § 1101(a)(42)(A).  An applicant can meet this definition by showing either (i) that he suffered past persecution or (ii) that he has a well-founded fear of being persecuted if returned to his home country.  In either case, the alleged persecution must be on account of a statutorily protected ground.  *Chavarria*, 446 F.3d at 516.

Although past persecution and future persecution are independent, "doctrinally distinct" grounds for asylum, they "intersect" in one significant respect: a showing of past persecution entitles the applicant to a rebuttable presumption of a well-founded fear of future persecution, which, if rebutted, could remove the basis for granting asylum.[3]  *Camara v. Att'y*

---

[3] Regardless of this rebuttable presumption, past persecution remains an independent basis for asylum because, in some cases, "the favorable exercise of discretion is warranted for humanitarian reasons even if there is little likelihood of future persecution."  *Al-Fara v. Gonzales*, 404 F.3d 733, 740 (3d Cir. 2005) (quoting *Matter of Chen,* 20 I. & N. Dec. 16, 18-19 (BIA 1989)); *accord Vongsakdy v. I.N.S.*, 171 F.3d 1203, 1206-07 (9th Cir. 1999); *Skalak v. I.N.S.*, 944 F.2d 364, 365 (7th Cir.

8

*Gen. U.S.*, 580 F.3d 196, 202 (3d Cir. 2009) (citing 8 C.F.R. § 208.13(b)(1)). "Ultimately, therefore, a well-founded fear of future persecution is the touchstone of asylum." *Id.* Thus, we first examine Sumaila's claim of past persecution before considering whether he has a well-founded fear of future persecution.

## A. Past Persecution

To establish past persecution, an applicant must show (i) that he was targeted for mistreatment "on account of one of the statutorily-protected grounds," (ii) that the "incident, or incidents" of mistreatment "rise to the level of persecution," and (iii) that the persecution was "committed by the government or forces the government is either unable or unwilling to control." *Abdulrahman v. Ashcroft*, 330 F.3d 587, 592 (3d Cir. 2003) (internal quotation marks and citation omitted).

As to the first requirement, the Government has not contested that Sumaila fits within one of the INA's protected categories. Nor could it. Sumaila's sexual orientation and identity as a gay man is enough to establish his membership in the lesbian, gay, bisexual, transgender and intersex (LGBTI) community in Ghana, a "particular social group" within the

---

1991) (explaining that, in some situations, the "experience of persecution may so sear a person with distressing associations with his native country that it would be inhumane to force him to return there, even though he is in no danger of further persecution"). Sumaila has not made that argument here, so we will not address it any further.

meaning of the INA, 8 U.S.C. § 1101(a)(42)(A).[4] *Amanfi v. Ashcroft*, 328 F.3d 719, 730 (3d Cir. 2003) (holding that sexual orientation is a cognizable basis for "membership in a social group"); *accord Bringas-Rodriguez v. Sessions*, 850 F.3d 1051, 1073 (9th Cir. 2017) (en banc) (affirming that "sexual orientation and sexual identity can be the basis for establishing a particular social group"); *Ayala v. Att'y Gen. U.S.*, 605 F.3d 941, 949 (11th Cir. 2010); *Kadri v. Mukasey*, 543 F.3d 16, 21 (1st Cir. 2008); *Moab v. Gonzales*, 500 F.3d 656, 661 n.2 (7th Cir. 2007); *Nabulwala v. Gonzales*, 481 F.3d 1115, 1117 (8th Cir. 2007) (recognizing that lesbians are members of a "particular social group" based on sexual orientation); *Hernandez-Montiel v. I.N.S.*, 225 F.3d 1084, 1094 (9th Cir. 2000) (holding that transgender individuals may be classified into a "particular social group" based on their "sexual orientation and sexual identity"), *overruled on other grounds by Thomas v. Gonzales*, 409 F.3d 1177 (9th Cir. 2005); *Matter of Toboso-Alfonso*, 20 I. & N. Dec. 819, 822 (BIA 1990).

In rejecting Sumaila's claim, however, the IJ found that Sumaila had "not established that he suffered mistreatment *on account of his sexual orientation* that rises to the level of persecution." JA24 (emphasis added). The BIA affirmed that

---

[4] We have adopted the term LGBTI in this opinion because we found it to be the more common formulation used across the relevant guidelines and reports issued by the U.S. Citizenship and Immigrations Services (USCIS), the U.S. State Department, and the United Nations High Commissioner for Refugees (UNHCR). We note that the IJ used the term LGBTQ (lesbian, gay, bisexual, transgender and queer or questioning). We see no meaningful distinction between these two formulations for purposes of our analysis.

10

finding without expressly reviewing the alleged motive of Sumaila's tormentors. We construe the IJ's and the BIA's truncated decisions as rejecting both Sumaila's claim that he was targeted "on account of" his sexual orientation and that he suffered persecution. *See Gomez-Zuluaga v. Att'y Gen. U.S.*, 527 F.3d 330, 346-47 (3d Cir. 2008). To satisfy the "on account of" or nexus requirement, Sumaila's sexual orientation must have been a motivating factor or "at least one central reason" for the alleged persecution. *Id*. at 340 (quoting 8 U.S.C. § 1158(b)(1)(B)(i)); *Lukwago v. Ashcroft*, 329 F.3d 157, 170 (3d Cir. 2003) ("A persecutor may have multiple motivations for his or her conduct, but the persecutor must be motivated, at least in part, by one of the enumerated grounds."). Here, there can be no serious dispute that the attack and threats Sumaila suffered were motivated by his sexual orientation. Sumaila credibly testified that the mob's violent and menacing behavior was instigated by his father's outrage at discovering him having sex with another man and offered evidence that his father explicitly connected this violent response to his disapproval of Sumaila's "homosexuality," JA166. Others in the mob wanted to report Sumaila to the police, further indicating that they were reacting to his same-sex relationship since that is the only conduct that could have conceivably incriminated Sumaila under Ghanaian law. Sumaila thus has demonstrated that he was targeted on account of his membership in a statutorily protected group.

Our focus now turns to the second requirement: whether the attack and death threats Sumaila suffered were serious enough to rise to the level of persecution. "While this Court has not yet drawn a precise line concerning where a simple beating ends and persecution begins, our cases suggest that isolated incidents that do not result in serious injury do not rise

11

to the level of persecution." *Voci v. Att'y Gen. U.S.*, 409 F.3d 607, 615 (3d Cir. 2005). In addition, it is "well settled that persecution does not encompass all forms of unfair, unjust, or even unlawful treatment." *Chavarria*, 446 F.3d at 518 (citing *Fatin v. I.N.S.,* 12 F.3d 1233, 1240 (3d Cir. 1993)). However, it is equally settled that persecution includes "death threats, involuntary confinement, torture, and other severe affronts to the life or freedom of the applicant." *Gomez-Zuluaga*, 527 F.3d at 341 (citing *Lin v. I.N.S.,* 238 F.3d 239, 244 (3d Cir. 2001)); *Chavarria*, 446 F.3d at 518.

The parties' disagreement centers around the reach of our decision in *Chavarria*. There, we held that death threats that are "highly imminent, concrete and menacing," and that "cause significant actual suffering or harm," are cognizable forms of persecution. 446 F.3d at 518, 520 (internal citations and quotation marks omitted). The petitioner, Chavarria, witnessed paramilitary forces assault two women who were local human rights activists. After the assailants left, Chavarria returned to help the women. He later noticed that he was being surveilled outside his home by men that looked like the assailants, which he understood to be an act of intimidation by government forces because of his actions in helping these two political activists. *Id.* at 513 & nn.2-4. While he was driving near his home one night, several men ran him off the road, forced him into the backseat of his car, and robbed him at gun point. The men held a gun to his head and told him, "We are going to leave you alone today, but if we ever catch you again you won't live to talk about it." *Id.* at 513, 519. We understood that event to be "about as clear a death threat as we might expect attackers to make." *Id.* at 520. And even though there was no evidence of "physical harm," *id.* at 515, we concluded that Chavarria suffered harm because he was "actually robbed"

12

with a "gun to his face," *id*. at 520. We reversed the BIA and held that these violent acts of intimidation constituted persecution. *Id*.

In a recent decision, issued after close of argument in this case, we elaborated on the test for when death threats amount to persecution. *See Herrera-Reyes v. Att'y Gen. U.S.*, __ F.3d __, No. 19-2255, 2020 WL 962071 (3d Cir. Feb. 28, 2020). In *Herrera-Reyes*, we reviewed our threat cases, including *Chavarria*, and concluded that a threat is persecutory when "the cumulative effect of the threat and its corroboration presents a real threat to a petitioner's life or freedom." *Id*. at *5. We clarified that "imminence" is not a distinct requirement, but rather "a concept subsumed in the inquiry as to whether the threat is 'concrete.'" *Id*. at *4. "We therefore refer to the standard going forward simply as 'concrete and menacing.'" *Id*. (citation omitted). A threat is "concrete" when it is "corroborated by credible evidence," and it is "menacing" when it reveals an "intention to inflict harm." *Id*. at *5 (internal quotation marks and citations omitted). Physical harm to the applicant is one factor in the cumulative analysis, it is not required to render a threat "concrete and menacing." *Id*. at *6-*7. The ultimate question, therefore, is whether "the aggregate effect" of the applicant's experience, "including or culminating in the threat," put the applicant's "life in peril or created an atmosphere of fear so oppressive that it severely curtailed [his] liberty." *Id.* at *5.

Crediting Sumaila's testimony as the BIA did, we know that a violent mob beat Sumaila with makeshift weapons and dragged him across the floor from his room to a courtyard, causing him to bleed from his mouth and suffer injuries to his head and back. Sumaila was then threatened with death by burning or beheading, at the same time that he was being

13

doused with kerosene and exposed to a cutlass. In combination with these violent acts of intimidation and his injuries, the death threats were sufficiently "concrete and menacing," *id.*, to transform this incident from a "simple beating," *Voci*, 409 F.3d at 615, into outright persecution. *Accord Gashi v. Holder*, 702 F.3d 130, 138 (2d Cir. 2012) ("Given the unrebutted evidence that Gashi was repeatedly warned, threatened with death, and attacked with deadly weapons including a knife and a metal knob while one attacker urged another to '[k]ill this dog here,' we do not see why such abuse does not constitute persecution." (alteration in original) (internal citation omitted)).

On appeal, the Government argues, rather insistently, that the threats to Sumaila's life were not "imminent or menacing" enough because they remained "unfulfilled," relying on *Li v. Att'y Gen. U.S.*, 400 F.3d 157 (3d Cir. 2005). Resp't Br. 18 n.4. While we appreciate that the Government did not have the benefit of our decision in *Herrera-Reyes*, that case squarely foreclosed this argument. We held that whether a threat is sufficiently "concrete and menacing," which includes the notion of "imminence," does not turn on whether the threat was ultimately fulfilled, but on whether – in the context of the applicant's cumulative experience – it was a "severe affront" to his "life or freedom." *Herrera-Reyes*, 2020 WL 962071, at *5 (internal quotation marks and citation omitted). The threats in *Li* were not persecutory because of "the lack of any corroborating harm" to the applicant or his close associates, not merely because they were unfulfilled. *Id.* at *4 (citing *Li*, 400 F.3d at 165).

Moreover, in *Li*, the applicant was threatened with forced sterilization, detention and physical abuse for violating China's population control policy, not death, so it made sense that we would consider whether any of those threats remained

14

unfulfilled in concluding that they were not sufficiently concrete and menacing. 400 F.3d at 159, 165. We find it odd for the Government to make this argument here considering that Sumaila was threatened with death by fire or decapitation while being assaulted, doused with fuel and exposed to a cutlass. All that was left for the mob to do was to cut off his head or set him on fire. *See Chavarria*, 446 F.3d at 520 ("This threat is unlike the threats we encountered in *Li*, which were merely verbal and not concrete because here, the attackers actually robbed Chavarria, pointed a gun to his face, and threatened him with death if he told his story."). Had Sumaila not managed to escape, he might very well be dead. To expect Sumaila to remain idle in that situation – waiting to see if his would-be executioners would go through with their threats – before he could qualify as a refugee would upend the "fundamental humanitarian concerns of asylum law." *Matter of S-P-*, 21 I. & N. Dec. 486, 492 (BIA 1996) ("In enacting the Refugee Act of 1980, Pub. L. No. 96-212, 94 Stat. 102 [amending the INA], Congress sought to bring the Act's definition of 'refugee' into conformity with the United Nations Convention and Protocol Relating to the Status of Refugees and, in so doing, give 'statutory meaning to our national commitment to human rights and humanitarian concerns.'") (footnote omitted) (citing S. Rep. No. 256, 96th Cong., 2d Sess. 1, 4, *reprinted in* 1980 U.S.C.C.A.N. 141, 144).

Neither the IJ nor the BIA addressed the significance of these threats under the dispositive case law available at that time, namely *Chavarria*, and that omission derailed their analysis. The IJ focused exclusively on the "beating," finding that this incident was not extreme enough to constitute persecution because Sumaila had only been attacked once and

he "did not require medical treatment." JA24 (relying on *Kibinda v. Att'y Gen. U.S.*, 477 F.3d 113, 119-20 (3d Cir. 2007); *Voci*, 409 F.3d at 615; and *Chen v. Ashcroft*, 381 F.3d 221, 235 (3d Cir. 2004)). The BIA agreed that this "isolated" incident did not rise to the level of persecution because Sumaila "was not so injured that he required medical attention and he was able to run to his friend's house, which was some distance away[.]" JA14 (relying on *Chen*, 381 F.3d at 234-35). That analysis was based on a misunderstanding of the law and must be reversed.

We have never held that persecution requires more than one incident. Rather, we have left open the possibility that a single incident, if sufficiently egregious, may constitute persecution. *Voci*, 409 F.3d at 615 (explaining that "the existence of multiple incidents is not a requirement"). In *Voci*, we cited two decisions from the Seventh Circuit to stress that the number of past incidents is "merely one variable" for finding past persecution, *id.* at 615 (quoting *Dandan v. Ashcroft*, 339 F.3d 567, 573 (7th Cir. 2003)), and that "even a single beating can constitute persecution," *id.* (citing *Asani v. I.N.S.*, 154 F.3d 719, 722-23 (7th Cir. 1998)).

Nor have we conditioned a finding of past persecution on whether the victim required medical attention or on whether he was too hurt to escape his aggressors, or even on whether the victim was physically harmed at all. *See Herrera-Reyes*, 2020 WL 962071, at *6 ("We have never reduced our persecution analysis to a checklist or suggested that physical violence—or any other single type of mistreatment—is a required element of the past persecution determination."); *Kibinda*, 477 F.3d at 120 ("[W]e do not mean to suggest that the severity of an injury should be measured in stitches[.]"). Quite the opposite. In *Chavarria*, we held that violent death

16

threats crossed the threshold into persecution, even though there was no indication that the applicant required medical care, was unable to run away, or was otherwise physically harmed. 446 F.3d at 515, 520; *see also Herrera-Reyes*, 2020 WL 962071, at \*8 (holding that, in context, a single death threat was persecution even without physical harm to the applicant).[5]

Sumaila's claim is more obvious than Chavarria's (or Herrera-Reyes'). In addition to having his life credibly threatened by accompanying acts of violent intimidation, Sumaila suffered actual physical harm from the beating, not to mention the emotional suffering he has endured. *See Mashiri v. Ashcroft*, 383 F.3d 1112, 1120 (9th Cir. 2004) ("Persecution may be emotional or psychological, as well as physical."). The Government admits that the assault caused "physically painful" injuries but insists that that record does not compel finding that this "unfortunate" beating was serious enough to be persecution. Oral Ar. at 14:40-53. It is debatable whether the record contains enough evidence to ascertain the full extent of Sumaila's injuries, but our decision need not hinge on the severity of those injuries because this case involves so much

---

[5] Neither *Chen* nor *Kibinda* foreclosed the possibility that outrageous conduct, even if limited to a single event without physical harm, could rise to the level of persecution, as was the case in *Chavarria*. Indeed, we have since made clear that physical harm is not required for a threat to be "concrete and menacing," so long as it "placed [the applicant's] life in peril or created an atmosphere of fear so oppressive that it severely curtailed [his] liberty." *Herrera-Reyes*, 2020 WL 962071, at \*5.

17

more.

Although Sumaila would succeed even in the absence of any physical injury under *Chavarria* (and now also under *Herrera-Reyes*), we note that the IJ and the BIA mischaracterized or misunderstood Sumaila's testimony with respect to his injuries. Sumaila never testified that he "did not require medical treatment." JA24. He testified: "I was so afraid, I was so, so afraid that *I couldn't even go* to a hospital. I was just afraid." JA115 (Tr. 53:20–21) (emphasis added). It may be that Sumaila should have sought medical care or that medical treatment was otherwise required. All we know from his testimony is that he did not *seek* medical care because he feared for his well-being. Nor does the fact that Sumaila had the strength to escape execution diminish the risk he faced or the severity of his injuries. To the contrary, it is a testament to the extreme fear he felt and to the sheer human will to survive the most dangerous of situations.

In short, because the IJ and the BIA accepted Sumaila's testimony as true "but then proceeded to misstate and ignore certain relevant aspects of that testimony," *Chavarria*, 446 F.3d at 522, and because they committed legal error by finding that a single beating without severe physical injury to Sumaila was dispositive, their determination that his experience did not rise to the level of past persecution must be overturned.

This brings us to the third requirement. Because Sumaila contends that he was attacked by private rather than government actors, he must demonstrate that Ghanaian authorities are unable or unwilling to control this sort of anti-gay violence. The Government argues that Sumaila cannot meet this requirement because he did not report the assault to the police – an omission that the Government believes is "fatal"

18

to his claim.  Resp't Br. 18.  We disagree.

"The absence of a report to police does not reveal anything about a government's ability or willingness to control private attackers; instead, *it leaves a gap in proof* about how the government would respond if asked, which the petitioner may attempt to fill by other methods."  *Bringas-Rodriguez*, 850 F.3d at 1066 (quoting *Rahimzadeh v. Holder*, 613 F.3d 916, 922 (9th Cir. 2010)).  An applicant may "fill the evidentiary gap" in various ways:

> 1) demonstrating that a country's laws or customs effectively deprive the petitioner of any meaningful recourse to governmental protection,
>
> 2) describing [p]rior interactions with the authorities,
>
> 3) showing that others have made reports of similar incidents to no avail,
>
> 4) establishing that private persecution of a particular sort is widespread and well-known but not controlled by the government, or
>
> 5) convincingly establish[ing] that [reporting] would have been futile or [would] have subjected [the

19

applicant] to further abuse.

*Id*. at 1066–67 (alterations in original) (internal quotation marks and citations omitted).

In *Bringas-Rodriguez*, the Ninth Circuit held that a gay applicant was not required to report abusers to Mexican authorities because "ample evidence," including the applicant's testimony, affidavits, country reports, and news clippings, "demonstrate[d] that reporting would have been futile and dangerous." *Id*. at 1073-74; *see Hernandez-Avalos v. Lynch*, 784 F.3d 944, 952 (4th Cir. 2015) (excusing the applicant's failure to report death threats to the police, because credible testimony and country conditions provided "abundant evidence" to conclude that reporting would have been counterproductive); *Matter of S-A-*, 22 I. & N. Dec. 1328, 1330, 1333, 1335 (BIA 2000) (concluding that a Muslim woman with liberal religious beliefs did not need to report her abusive orthodox father to police to establish the Moroccan government's inability or unwillingness to protect her, because it was clear from country conditions and credible testimony that it would have been "unproductive" and "potentially dangerous" to do so under Moroccan law and "societal religious mores").

Here, the record is replete with evidence that Ghanaian law deprives gay men such as Sumaila of any meaningful recourse to government protection and that reporting his incident would have been futile and potentially dangerous.

Ghana criminalizes same-sex male relationships under the guise of "unnatural carnal knowledge," defined to include "sexual intercourse with a person in an unnatural manner or with an animal." Ghana Criminal Code § 104(2); *see* JA183.

20

The text of this law – equating same-sex male relationships to sex with an animal – is already a clear indication of the government's official position on gay men. Although the law classifies consensual sex between men as a "misdemeanor," Ghana Criminal Code § 104(1)(b), the offense is punishable by up to three years in prison, Ghana Criminal Procedure Code § 296(4).[6] Prosecution and disproportionate punishment based on any of the INA's protected grounds, including sexual orientation, are cognizable forms of persecution, "even if the law is 'generally' applicable." *Chang v. I.N.S.*, 119 F.3d 1055, 1061, 1067 (3d Cir. 1997) (holding that prosecution and "punishment of up to one year of imprisonment [on account of political opinion], and perhaps significantly more, are sufficiently severe to constitute 'persecution' under this Circuit's standard in *Fatin*") (citing *Rodriguez-Roman v. I.N.S.*, 98 F.3d 416, 431 (9th Cir. 1996), and *Matter of Janus & Janek*, 12 I. & N. Dec. 866, 875 (BIA 1968)); *accord Bromfield v. Mukasey*, 543 F.3d 1071, 1077 (9th Cir. 2008) ("Because the prohibition [of homosexual conduct] is directly

---

[6] When a foreign law is raised, federal courts have discretionary authority to investigate the content of that law pursuant to Federal Rule of Civil Procedure 44.1, which states that "the court may consider any relevant material or source . . . whether or not submitted by a party," and "the court's determination must be treated as a ruling on a question of law." *See Henriquez-Rivas v. Holder*, 707 F.3d 1081, 1092 (9th Cir. 2013) (en banc); *Abdille*, 242 F.3d at 489-90 n.10 (recognizing this discretionary authority in the context of reviewing asylum appeals but declining to exercise it in the circumstances of that case) (citing *Sidali v. I.N.S.*, 107 F.3d 191, 197 n.9 (3d Cir. 1997)); *Sidali*, 107 F.3d at 197 ("The determination of foreign law in the federal courts is a question of law.").

related to a protected ground—membership in the particular social group of homosexual men—prosecution under the law will always constitute persecution."); *Perkovic v. I.N.S.*, 33 F.3d 615, 622 (6th Cir. 1994) (holding that prosecution and incarceration under a law prohibiting "peaceful expression of dissenting political opinion" would amount to persecution).

Had Sumaila reported the beating or threats, he would have outed himself and his partner to the police and, on that basis, he could have been arrested, prosecuted and incarcerated, compounding the persecution he had already suffered. This fact alone is compelling, if not dispositive, evidence that Sumaila had no meaningful recourse against his father's and the mob's homophobic violence. At best, seeking help from the police would have been counterproductive.

Furthermore, the State Department's 2016 country report indicates that LGBTI persons in Ghana are generally afraid to report homophobic abuse because they fear further harassment and intimidation at the hands of police officers. The report states:

> [LGBTI persons] faced police harassment and extortion attempts. There were reports police were reluctant to investigate claims of assault or violence against LGBTI persons. . . .
>
> While there were no reported cases of police or government violence against LGBTI persons during the year, *stigma, intimidation, and the attitude of the police toward*

22

*LGBTI persons were factors in preventing victims from reporting incidents of abuse*.

JA183-84 (emphasis added). The Amnesty International 2016/17 country report provides additional support for that assessment, stating that "[l]ocal organizations reported that LGBTI people continued to face police harassment." JA195.

In fact, Sumaila credibly testified that he did not report the assault and death threats because he feared negative repercussions for being gay: "I know that [homosexuality] is not something that is acceptable in my country, I know that the police would not like it as well, so my heart was racing, I was afraid. I was very afraid." JA102 (Tr. 40:10-12). Sumaila was not alone in his fear. His friend was also afraid to call the police out of concern that his own life would be threatened for sheltering a gay man. There is also evidence that Sumaila's tormentors felt empowered by law to respond violently to his same-sex relationship. Sumaila testified that certain people in the mob wanted to report *him* to police, not because they wanted to rescue him, but because they wanted to punish him, apparently fearing no consequences for their own homicidal and criminal conduct. In those circumstances, it is unreasonable to expect Sumaila to turn to the police for protection.

The record also shows that the Ghanaian government is unable or unwilling to protect LGBTI persons from other forms of mistreatment. For instance, Ghanaian law does not prohibit anti-gay discrimination even though there is a well-documented hostility towards the LGBTI community throughout the country. According to the State Department country report, "societal discrimination against [LGBTI]

23

individuals" rises to the level of a "human rights problem," JA173, and discrimination against LGBTI individuals in education and employment is "widespread," JA183. The report cites data from Ghana's Commission on Human Rights and Administrative Justice, showing that "men who have sex with men" are among the groups of people who have reported incidents of "stigma and discrimination," including breaches of protected health information, blackmail/extortion, harassment/threats, and violence or physical abuse. JA184. Amnesty International's country report confirms that LGBTI individuals face "discrimination, violence and instances of blackmail in the wider community." JA195. Sumaila submitted other evidence echoing these accounts, including a letter from his friend stating that "authorities in Ghana ha[ve] minimal concern[] for gay rights and politicians are always promising electorates of eradicating gays," JA162 ¶ 11, as well as a news report evincing anti-gay political rhetoric ahead of the 2016 general elections.

Notwithstanding all of this evidence, the IJ concluded that "country conditions do not indicate" that the Ghanaian government is unable or unwilling to protect Sumaila as a gay man. JA25. The IJ found that, even though same-sex male relationships are criminalized and "discrimination against LGBTQ individuals is not illegal," Ghanaian authorities could be expected to "prosecute individuals who commit assault against LGBTQ persons because of their sexual orientation." JA25. He noted that the State Department country report referenced "a case that was underway in which an individual was being prosecuted for assaulting a gay man in Accra in 2015." JA25 n.2. The IJ also discounted reports of "stigma [and] intimidation by the police," because "there were no reports of police or government violence against LGBTQ

24

persons." JA25. In affirming the IJ's decision, the BIA emphasized that, even though sex between men is criminalized, "the offense is only a misdemeanor." JA15, 25.

Given the totality of the record, these findings cannot withstand even our most deferential review. Although technically correct that sex between men is classified as a "misdemeanor," the IJ and the BIA failed to appreciate the serious risks of revealing a same-sex relationship to the police, not the least of which is the affront to the victim's freedom from being prosecuted and punished like a common criminal, or how those risks effectively prevent victims of anti-gay violence from seeking government protection. *See Lawrence v. Texas*, 539 U.S. 558, 575 (2003) ("The offense [consensual sex between men], to be sure, is but a class C misdemeanor, a minor offense in the Texas legal system. Still, it remains a criminal offense with all that imports for the dignity of the persons charged.").

The IJ and the BIA also ignored the fact that "stigma, intimidation, and the attitude of the police toward LGBTI persons" are "factors in preventing victims from reporting incidents of abuse." JA184. Considering that homophobic violence goes largely unreported because LGBTI persons fear harassment and extortion at the hands of police officers, one case in which anti-gay violence was supposedly prosecuted is hardly probative of the government's ability or willingness to protect gay men. Because the IJ and the BIA disregarded, mischaracterized and understated evidence favorable to Sumaila, including relevant portions of his testimony and the country reports, "the BIA succeeded in reaching a conclusion not supported by substantial evidence such that we are compelled to reach a conclusion to the contrary." *Chavarria*,

25

446 F.3d at 517-18.

Lastly, days before oral argument, the Government filed a letter styled under Federal Rule of Appellate Procedure 28(j), suggesting for the first time that, if this case were remanded, we should instruct the BIA to reconsider the issue of whether the Ghanaian government is unable or unwilling to control the alleged persecution under the Attorney General's guidance in *Matter of A-B-,*27 I. & N. Dec. 316 (A.G. 2018).

The Government did not raise remand or *Matter of A-B-* in its brief, even though that case was issued months after the BIA's ruling and months before the Government filed its brief in this Court. Therefore, that argument is waived. *See United States v. Hoffecker*, 530 F.3d 137, 163 (3d Cir. 2008) (holding that appellant had waived argument raised for the first time in a Rule 28(j) letter); *United States v. Leeson*, 453 F.3d 631, 638 n.4 (4th Cir. 2006) (holding that appellant had waived argument based on a case raised for the first time in a Rule 28(j) letter when that case was readily available at the time appellant filed its brief).[7]

---

[7] In any event, at oral argument, the Government took seemingly conflicting positions, conceding at one point that *Matter of A-B-* does not apply to this case. Given the Government's own hesitation in relying on *Matter of A-B-* in this case, the relevance of that decision is doubtful at best, so we see no benefit in remanding to the BIA with instructions to revisit this issue. We take no position as to whether *Matter of A-B-* has materially changed the relevant standard or whether the Government could properly move to relitigate this issue on remand. *See Grace v. Whitaker*, 344 F. Supp. 3d 96, 130, 146 (D.D.C. 2018) (permanently enjoining the Government from

26

In sum, the record before us compels finding that Sumaila suffered past persecution.

## B. Well-Founded Fear of Future Persecution

Next, we review the IJ's and the BIA's determination that Sumaila does not have a well-founded fear of future persecution. Given that Sumaila has demonstrated past persecution on account of his sexual orientation and identity as a gay man, he is entitled to a rebuttable presumption of a "well-founded fear of future persecution" on the same basis. 8 C.F.R. § 208.13(b)(1).

To rebut that presumption, the Government would need to prove by a preponderance of the evidence either that Sumaila could escape persecution by relocating to another part of Ghana and that "relocation would be reasonable," or that conditions in Ghana have so fundamentally changed, *i.e.*, *improved* for gay men specifically since Sumaila was persecuted in 2016, that his past persecution is no longer indicative of the risk he faces if returned to Ghana. *Leia v. Ashcroft*, 393 F.3d 427, 437 (3d Cir. 2005); *Konan v. Att'y Gen. U.S.*, 432 F.3d 497, 501 (3d Cir. 2005); *see Berishaj v. Ashcroft*, 378 F.3d 314, 327 (3d Cir. 2004) ("[G]eneralized improvements in country conditions will not suffice as

applying certain aspects of *Matter of A-B-* as arbitrary, capricious, and unlawful, and holding that the "'unwilling or unable' persecution standard was settled at the time the Refugee Act was codified, and therefore the Attorney General's 'condoned' or 'complete helplessness' standard is not a permissible construction of the persecution requirement"), *appeal pending*, No. 19-5013 (D.C. Cir.).

rebuttals to credible testimony and other evidence establishing past persecution."), *abrogated on other grounds by Nbaye v. Att'y Gen. U.S.*, 665 F.3d 57 (3d Cir. 2011). The Government was not held to this burden, nor was Sumaila afforded the benefit of this favorable presumption, because both the IJ and the BIA incorrectly concluded that he had not suffered past persecution.

Ordinarily, we would vacate this portion of the BIA's decision and remand with instructions to reconsider the issue of future persecution from the correct vantage point. *See Konan*, 432 F.3d at 501 (explaining that our review of the BIA's decision "is limited to the rationale that the agency provides," and that we are "powerless to decide in the first instance issues that an agency does not reach"); *Lusingo v. Gonzales*, 420 F.3d 193, 201 (3d Cir. 2005) ("When deficiencies in the BIA's decision make it impossible for us to meaningfully review its decision, we must vacate that decision and remand so that the BIA can further explain its reasoning." (quoting *Kayembe v. Ashcroft,* 334 F.3d 231, 238 (3d Cir. 2003))). But remand for this purpose is not necessary here, because even without applying the presumption and corresponding burden-shifting framework, the IJ's and the BIA's finding that Sumaila does not have a well-founded fear of future persecution cannot stand on this record. *See Chavarria*, 446 F.3d at 520-22 (reversing BIA on past persecution and future persecution without applying the presumption).

Furthermore, considering that the Government did not introduce evidence of changed country conditions or even attempt to make the case that conditions have changed, it would be unfair to give the Government a second bite at the apple. *See Toure v. Att'y Gen. U.S.*, 443 F.3d 310, 321-23 (3d

28

Cir. 2006); *Baballah v. Ashcroft*, 367 F.3d 1067, 1078 & n.11 (9th Cir. 2004).  Thus, we review the IJ's and the BIA's future persecution determination as they made it: putting the burden on Sumaila.

An applicant that has not suffered past persecution may still qualify for asylum if he can demonstrate that he has a well-founded fear of future persecution either (i) "because he would be  individually singled out for persecution" on  account  of  a statutorily protected ground, or (ii) "because there is a pattern or practice in his home country of persecution against a group of which he is a member."  *Khan v. Att'y Gen. U.S.*, 691 F.3d 488, 496 (3d Cir. 2012) (quoting *Huang,* 620 F.3d at 381). "The source of the persecution must be the government or forces that the government is unwilling or unable to control." *Id*. (quoting *Ahmed v. Keisler,* 504 F.3d 1183, 1191 (9th Cir. 2007)).  The applicant's fear of persecution must be "genuine" and "reasonable  in  light  of  all  of  the  record  evidence." *Lusingo*, 420 F.3d at 199 (characterizing "well-founded fear of future persecution" as having both a subjective and objective component.    The IJ found that, although Sumaila "ha[d] credibly  testified  that  he  subjectively  fears  persecution  if returned to Ghana," he failed to show that "a reasonable person would  fear  the  same."    JA25.    There  is  no  dispute  that Sumaila's subjective fear is genuine.    Thus, we focus on whether Sumaila's fear of future persecution is objectively reasonable.

To satisfy the objective component, an applicant must produce  evidence  showing  that  future  persecution  is  a "reasonable possibility."  *Lukwago*, 329 F.3d at 175.  Under this standard, the applicant is not required to prove that future persecution is "more likely than not" to occur.  *Id.* at 177 (citing *I.N.S. v. Cardoza-Fonseca*, 480 U.S. 421, 423 (1987)).  Even a

ten percent chance will do. *Cardoza-Fonseca*, 480 U.S. at 431. The applicant's credible testimony alone may be enough to satisfy this requirement. *Dong v. Att'y Gen. U.S.*, 638 F.3d 223, 228 (3d Cir. 2011) (citing 8 C.F.R. § 208.13(a) ("The testimony of the applicant, if credible, may be sufficient to sustain the burden of proof without corroboration.")). He may also rely on the testimony of corroborating witnesses and evidence of country conditions to bolster his claim. *Id*.

Here, the IJ found that, even though Sumaila "fears his father will try to kill him if he returns to Ghana," he had not proven "by a preponderance of credible and probative evidence" that "he faces a 'reasonable possibility' of being singled out for persecution in Ghana." JA25. The IJ noted that "country conditions do not indicate" that Sumaila would be subject to any mistreatment that rises to the level of persecution. JA25. The IJ also found that, while there may be a risk of "stigma or intimidation by the police," the risk was not significant enough because "there were no reports of police or government violence against LGBTQ persons." JA25. And although "discrimination against LGBTQ individuals is not illegal," the IJ found that Ghanaian authorities could be expected to protect gay men from homophobic abuse based on a single case in which anti-gay violence was supposedly prosecuted. JA25. In affirming the IJ's decision, the BIA emphasized that sex between men is "only a misdemeanor" and that any "discrimination" Sumaila "may face in Ghana does not rise to the level of persecution." JA15. These findings are not supported by substantial evidence, because they are based on mischaracterizations, unreasonable inferences, and an incomplete assessment of the record.

Sumaila has produced ample evidence to conclude that there is a reasonable possibility that he would be singled out

30

for persecution in Ghana because he is gay. Sumaila credibly testified that his father is still looking for him and continues to tell people that he will kill Sumaila when he finds him because he is ashamed of his sexual orientation. These are not empty threats. Recall that Sumaila's father and his cohort beat Sumaila with iron rods and wooden sticks and dragged him across the floor from his bedroom into a courtyard, where they doused him with fuel and brandished a cutlass, all while threatening to decapitate him or set him on fire. That incident is indicative of the type of anti-gay violence awaiting Sumaila if he returns home. *See Chavarria*, 446 F.3d at 520 (noting that, even if past threats are not treated as persecution, "they are often quite indicative of a danger of future persecution"). Based on Sumaila's experience, we hold that the ongoing threats to his life are "menacing and credible" enough to "imply a risk of future persecution." *R.R.D. v. Holder*, 746 F.3d 807, 810 (7th Cir. 2014) (accepting the applicant's testimony that his persecutors were still looking for him and threatening him). The IJ's and the BIA's failure to consider the risk presented by these threats in light of Sumaila's experience doomed their future persecution analysis.

Sumaila has also demonstrated that his experience was not a random or isolated act of private violence, but rather part of a pattern or practice of persecution against the LGBTI community in Ghana more generally. Sumaila credibly testified that anti-gay attitudes are not unique to his family or neighbors; they are common among the country's Muslim and Christian populations at large. The State Department's and Amnesty International's country reports concur that anti-gay discrimination, harassment, and violence are a country-wide human rights problem, due in large part to the fact that same-sex male relationships are criminalized and discrimination

31

against LGBTI persons is not illegal. As explained more fully above, Sumaila cannot count on Ghanaian authorities to protect him as an outed gay man. When "stigma, intimidation, and the attitude of the police toward LGBTI persons" are significant "factors in preventing victims from reporting" anti-gay violence, JA184, the absence of reported incidents cannot be dispositive of the degree of risk of future persecution.

Up until the attack, Sumaila's ability to avoid this sort of homophobic abuse hinged on his ability to dissemble his sexual orientation and keep his sexual relationship with his partner hidden. No major leap is required to conclude that other gay men like Sumaila are escaping persecution by hiding or suppressing their sexuality as well. Indeed, anti-gay laws such as Ghana's criminalization of sex between men are intended to stigmatize and punish, in effect, to suppress the expression of gay identity and sexuality in society. *Cf. Lawrence*, 539 U.S. at 581 (O'Connor, J., concurring) ("[T]he effect of Texas' sodomy law is not just limited to the threat of prosecution or consequence of conviction. Texas' sodomy law brands all homosexuals as criminals, thereby making it more difficult for homosexuals to be treated in the same manner as everyone else."). Secreting his gay identity is not a workable solution for Sumaila. Now that he has been publicly outed by his father, the risk of future persecution at the hands of uncontrolled private actors has increased, as evidenced by his father's success at enlisting neighbors willing to assault and kill Sumaila because he is gay.

Sumaila is also at a higher risk of being prosecuted and punished, *i.e.*, persecuted by the state, after being outed as a

gay man.[8]  The Government responds that any future risk of arrest is not persecution because it would be "arbitrary."  Oral Arg. at 21:25.  That argument misses the mark.  The issue is not arbitrary arrest but state-sanctioned prosecution and punishment on account of a statutorily protected status.  In no other context would prosecution and disproportionate punishment based on any of the INA's protected grounds be anything other than persecution.  If Sumaila were facing these risks because of his religious beliefs or political opinion, we would not hesitate to find an objectively reasonable fear of future persecution in these circumstances.  *See, e.g., Chang*, 119 F.3d at 1067 (finding reasonable fear of future persecution based on the risk of being prosecuted and incarcerated for up to a year or more on account of political opinion).

The Government further argues that any "discrimination" Sumaila faces in Ghana is "insufficient to rise to the level of persecution."  Resp't Br. 19 (citing *Gonzalez-Posadas v. Att'y Gen. U.S.*, 781 F.3d 677 (3d Cir. 2015)).  To be clear, "discrimination" is a gross mischaracterization of the risk Sumaila faces if returned to Ghana.  Moreover, *Gonzalez-Posadas* is inapposite.  That case did not deal with asylum but with withholding of removal, which requires a higher threshold than the more forgiving "reasonable possibility" standard required for asylum.  *See id*. at 688.  There, the court upheld the BIA's finding that a Honduran gay man had not established

---

[8] Incarceration is not the only risk.  According to the State Department country report, "[g]ay men in prison were often subjected to sexual and other physical abuse."  JA183-84.  Nothing in the record suggests that Ghanaian authorities are making any efforts to combat that sort of homophobic violence.

33

that it was "more likely than not" that he would be persecuted "on account of his sexual orientation," and ruled that "the record [did] not compel the conclusion that there [was] a 'systematic, pervasive, or organized' pattern or practice of persecution of LGBT persons in Honduras," to warrant withholding of removal. *Id.* Notably, unlike here, there was no indication that Honduras criminalizes same-sex male relationships. And, unlike here, "the Honduran government ha[d] established a special unit in the attorney general's office to investigate crimes against LGBT persons and other vulnerable groups." *Id.* Inversely, here, unlike in *Gonzalez-Posadas*, there is no dispute that Sumaila was targeted because of his sexual orientation.

In short, we hold that Sumaila's objective experience with anti-gay violence, the ongoing threats to his life, Ghana's criminalization of same-sex male relationships and the widespread unchecked discrimination against LGBTI persons, "combine to satisfy the requirement that [his] fear of persecution be objectively reasonable." *Gomez-Zuluaga*, 527 F.3d at 348 (holding that an applicant's fear was objectively reasonable based on her "objective experience" of past violence against her family, "the threats she herself ha[d] received," and the country reports corroborating the widespread risk of further persecution); *accord Chavarria*, 446 F.3d at 521-22.

Lastly, Sumaila must show that he cannot avoid persecution by relocating to another part of the country or that relocation is unreasonable. 8 C.F.R. § 208.13(b)(2)(ii). The IJ found that there was no indication that Sumaila "would not be safe from his family if he relocated to another part of Ghana." JA25. That finding is based on unreasonable presumptions and a misunderstanding or mischaracterization of relevant

34

evidence. Sumaila has reason to believe his father is still looking for him. Nothing in the record suggests that Sumaila's father cannot travel freely around the country in search of Sumaila. Considering that Ghana's criminalization of same-sex male relationships is country-wide, and that "widespread," JA183, homophobia and anti-gay abuse is a "human rights problem," JA173, relocation is not an effective option for escaping persecution.

Nor is it a reasonable solution. Relocation is not reasonable if it requires a person to "liv[e] in hiding." *Agbor v. Gonzales*, 487 F.3d 499, 505 (7th Cir. 2007); *accord Singh v. Sessions*, 898 F.3d 518, 522 (5th Cir. 2018) ("The case law is clear that an alien cannot be forced to live in hiding in order to avoid persecution."). To avoid persecution now that he has been outed, Sumaila would have to return to hiding and suppressing his identity and sexuality as a gay man. Tellingly, the IJ's observation, no matter how ill-advised, that Sumaila could avoid persecution and live a "full life" if he kept "his homosexuality a secret," JA25, was a tacit admission that suppressing his identity and sexuality as a gay man is the only option Sumaila has to stay safe in Ghana. The notion that one can live a "full life" while being forced to hide or suppress a core component of one's identity is an oxymoron. *See Qiu v. Holder*, 611 F.3d 403, 409 (7th Cir. 2010) ("[T]he only way Qiu can avoid persecution is to cease the practice of [his religion] or hope to evade discovery. Putting Qiu to such a choice runs contrary to the language and purpose of our asylum laws."); UNHCR, *Guidelines on International Protection No. 9: Claims to Refugee Status based on Sexual Orientation and/or Gender Identity within the context of Article 1A(2) of the 1951 Convention and/or its 1967 Protocol Relating to the Status of Refugees* at ¶ 27 (2012) [hereinafter

35

"UNHCR Sexual Orientation Guidelines"] ("Even if irregularly, rarely or ever enforced, criminal laws prohibiting same-sex relations could lead to an intolerable predicament for an LGB person rising to the level of persecution.").[9] Thus, on this record, Sumaila has made a compelling case that moving to another part of the country is not an effective or reasonable means of avoiding persecution.

In summary, the record compels finding that there is, at least, a "reasonable possibility" that Sumaila will be persecuted in Ghana because he is gay, and therefore, he has demonstrated a well-founded fear of future persecution.

\* \* \*

We conclude with a final observation about Sumaila's claim for withholding of removal. Unlike asylum, withholding

---

[9] The introduction to the UNHCR Sexual Orientation Guidelines notes that they are intended to "complement the *UNHCR Handbook on Procedures and Criteria for Determining Refugee Status under the 1951 Convention* (Reissued, Geneva, 2011)." While these sources lack the "force of law," they provide "significant guidance" for processing asylum claims in accordance with international standards in the United States. *Chang*, 119 F.3d at 1061-62 (quoting *Cardoza-Fonseca*, 480 U.S. at 439 n.22); *see, e.g., Bringas-Rodriguez*, 850 F.3d at 1057 n.2 (referencing UNHCR Sexual Orientation Guidelines); *N-A-M v. Holder*, 587 F.3d 1052, 1061 (10th Cir. 2009) (Henry, J., concurring) (noting that "our Supreme Court has consistently turned for assistance [to UNHCR] in interpreting our obligations under the Refugee Convention").

of removal is nondiscretionary if the applicant can show a "clear probability" of future persecution, *i.e.*, that the feared persecution is "more likely than not" to occur. *Gonzalez-Posadas*, 781 F.3d at 684, 687.

In the absence of evidence that the Ghanaian government is looking to prosecute Sumaila or that other gay men have been prosecuted in Ghana, or other evidence that government officials are directly responsible for persecutory violence against LGBTI persons, the current record does not compel – nor preclude – finding that Sumaila is "more likely than not" to be persecuted by government actors if returned to Ghana. *See Bromfield*, 543 F.3d at 1079 (remanding on the issue of "clear probability" with instructions to consider whether "the Jamaican law criminalizing homosexual conduct," "combined with evidence of widespread violence targeted at homosexuals, makes it more likely than not that [the applicant] will be persecuted on account of his sexual orientation").

By contrast, Sumaila has made a stronger showing that, now that he has been outed as a gay man, he is more likely than not to be singled out for persecution by uncontrolled private actors. That finding may even be compelled by the record when viewed through the lens of the favorable presumption to which he is entitled. *See Gonzalez-Posadas*, 781 F.3d at 684 (noting that this presumption applies to withholding of removal). Because we believe our decision today is enough to qualify Sumaila for a discretionary grant of asylum, we will not undertake to apply this presumption in the first instance, even though it would be appropriate to do so since the Government has not attempted to make the case that country conditions have changed. *See Toure*, 443 F.3d at 322 (applying the presumption in the first instance). Therefore, we leave it to the

37

BIA, if necessary, to reconsider on remand the question of whether Sumaila has satisfied the heightened standard for withholding of removal consistent with our finding that he suffered past persecution and has a well-founded fear of future persecution.[10]

## IV. CONCLUSION

Because Sumaila suffered past persecution and has a

---

[10] In case the BIA decides to remand to the IJ for any reason, we caution the IJ to exercise greater sensitivity when processing Sumaila's application, as we are troubled by some of the IJ's comments and questions. In addition to suggesting that Sumaila would be better off hiding his identity as a gay man, the IJ questioned Sumaila in explicit detail about his sexual relations with Inusah, going so far as to ask about sexual positions. It is unclear why that line of questioning would be relevant to Sumaila's claim, but to the extent those questions were intended to establish or test his self-identification as a gay man, they were off base and inappropriate. We urge IJs to heed sensible questioning techniques for all applicants, including LGBTI applicants. *See Razkane v. Holder*, 562 F.3d 1283, 1288 (10th Cir. 2009) (censuring an IJ for relying on his own misguided stereotypes of gay men); *Ali v. Mukasey*, 529 F.3d 478, 492 (2d Cir. 2008) (cautioning against "impermissible reliance on preconceived assumptions about homosexuality and homosexuals"); USCIS, *RAIO Directorate – Officer Training: Guidance for Adjudicating Lesbian, Gay, Bisexual, Transgender, and Intersex (LGBTI) Refugee and Asylum Claims* 34 (Dec. 28, 2011) ("The applicant's specific sexual practices are not relevant to the claim for asylum or refugee status. Therefore, asking questions about 'what he or she does in bed' is never appropriate."); UNHCR Sexual Orientation

38

well-founded fear of future persecution on account of his sexual orientation and identity as a gay man, he qualifies as a refugee under the INA. Therefore, we will vacate the BIA's decision and remand for further proceedings consistent with this opinion.[11]

---

Guidelines ¶ 63.vii ("Detailed questions about the applicant's sex life should be avoided."); *see also* Kimberly Topel, *"So, What Should I Ask Him to Prove that He's Gay?": How Sincerity, and Not Stereotype, Should Dictate the Outcome of an LGB Asylum Claim in the United States*, 102 IOWA L. REV. 2357, 2374 (2017) ("IJs who use stereotypes as a basis for their decisions and subject respondents to demeaning and irrelevant questioning about their sexuality do more than just risk excluding those who truly are refugees—the negative psychological effects on respondents in these situations have been well-documented.").

[11] We acknowledge and thank the instructors and students from the Immigration Law Clinic at West Virginia University College of Law for their skillful *pro bono* representation of the petitioner in this appeal.